## PACIFIC MILL & MINING CO. v. LEETE.

(Circuit Court of Appeals, Ninth Circuit. May 15, 1899.)

### No. 500.

**1. ESTOPPEL IN PAIS—ACQUIESCENCE IN CLAIM OF ANOTHER.**

Where, at the time of the sale of property situated on public land, it was understood between the parties, though not stated in the contract, that the purchaser claimed the right to collect and receive a sum due from the United States on account of the cancellation of an entry made of the land, on which the purchase money had been paid, and thereafter, at the request of the purchaser, the seller, with knowledge of the facts, executed a power of attorney to enable the purchaser to collect the money in its name, which he took steps to do, the seller was estopped to subsequently revoke such power of attorney and collect the money and retain it for its own use, which prevented the purchaser from itself afterwards collecting and retaining the money.

**2. ESTOPPEL.**

The acquiescence by a seller of property in a claim of the purchaser to a sum to be refunded by the government on account of the concellation of an entry of land on which the property was situated created an estoppel, which prevented the seller from itself collecting and retaining the money.

In Error to the Circuit Court of the United States for the District of Nevada.

This was an action brought in the district court of Nevada for Washoe county by B. F. Leete against the Pacific Mill & Mining Company, a California corporation, to recover the sum of $3,200 received by the mining company from the United States. The complaint alleged that this money was received for the use and benefit of the plaintiff. The mining company admitted the collection of $3,200 from the government, but denied that any part of it was received to or for the use or benefit of Leete, or that any portion of it was due to him. The case was transferred to the circuit court of the United States for the district of Nevada, and there decided in favor of the plaintiff (88 Fed. 957). The defendant (Pacific Mill & Mining Company) has brought the case here upon a writ of error. The action is based upon negotiations between the respective parties in connection with the sale and purchase of 1,280 acres of land in Churchill county, Nev., and the personal property and improvements thereon, known as the "Eagle Salt Works."

The statement of facts in this case, as contained in the opinion delivered by his honor, Judge Hawley, in the court below, is conceded by the plaintiff in error to be full and correct, and is the following:

"In 1877 the plaintiff and C. H. Van Gorder, having previously acquired the possessory right to the land in question, applied through the proper land office for a patent thereto from the United States, and paid to the proper officers the sum of $3,200 for said land. Thereafter, in January, 1878, the property in the meantime having been placed in the possession of a receiver, the plaintiff conveyed his undivided one-half interest therein to W. N. Leete. The deed contained this reservation: 'But it is not intended hereby to convey or transfer any interest which party of the first part has or may have to any moneys or accounts in the hands of such receiver, as receiver.' On the same day W. N. Leete conveyed the property to the defendant herein with the same reservation. In March, 1880, the defendant acquired, by deed, the interest in the property of the estate of C. H. Van Gorder, deceased. The application for a patent to the land was canceled by the land department in 1890. In the fall of 1894 negotiations were commenced between the parties hereto with reference to the plaintiff purchasing the property. All of the negotiations were by correspondence. The first was a letter from plaintiff to John W. Mackay, the president of the defendant corporation. D. B. Lyman was at the time of the correspondence the superintendent and managing agent of defendant in the state of Nevada. In February, 1895, plaintiff addressed a letter to Mr. Lyman, saying: 'In December my son * * * wrote me that you wished to sell your Eagle

Salt Works for cash; also that you wished to engage salt for your own mills. Kindly please state your price.' On the same day Mr. Lyman sent a reply, stating: 'Whilst I am not prepared to give you a positive answer, as the matter must be submitted to Mr. Mackay for his approval, I think you can purchase the property, with all salt on hand, etc., and all personal property at the works for $6,000, we reserving the right and you guarantying to furnish us with salt for our use f. o. b. cars at works for $4 per ton. We could not agree to take any stated number of tons, as our present consumption amounts to very little; but we do want reserved rights for mill salt at the stated price. We have on hand mill salt, 803 tons: table, 96: stock, 46 tons.' On February 21, 1895, the plaintiff wrote to Mr. Lyman, stating that he did not consider the property a desirable investment at the price of $6,000, but said: 'If we can agree on a price, I will buy.' On February 23d Mr. Lyman answered: 'I would suggest that you write me, or address Mr. Mackay through me, stating the price you are willing to give for the Eagle Salt Works property. I will forward your aper to him and await his decision. I have advised Messrs. Mackay and Flood to sell the property for $6,000, knowing the money paid the government for the land can be recovered, and assuming that the Eagle Salt Works property, with its supplies, salt on hand, et cetera, is worth at least $3,000.' On February 26th the plaintiff wrote to Mr. Lyman as follows: 'Replying to yours of the twenty-first as to the value of the Eagle Salt Works property depending on the recovery of the purchase money from the government, who recovers from the government must deed to the government and abandon all claim to the land, and surrender the receiver's receipt. It is not likely that any person desirous of claiming and holding title to land would solemnly file and record an abandonment; besides, when I deeded to W. N. Leete, I reserved all moneys of account. If I ever owned one-half of that money, I own it now. As you suggest, I will address Mr. Mackay through you.' On March 28th plaintiff wrote to Mr. Mackay, reciting the substance of the former letters between himself and Lyman, and then made the following offer: 'For a bargain and sale deed and possession of your Eagle Salt Works property, as it stands, I will give you in gold coin $3,500; also, at my expense and charge, furnish and load, to your order, at any time within five years, without charge to you, f. o. b. cars in car-load lots, in bulk, at Eagle Salt Works, nine hundred and forty-five tons of mining salt, of like quality to that now on hand. This agreement to bind myself, heirs, and assigns. You put deed in escrow, Bank of Nevada, and I will meet it with $3,500 and agreement to load as above. You put me in possession of the property.' This letter was sent to Mr. Lyman, and plaintiff received a reply stating that he had forwarded the letter to Mr. J. L. Flood, San Francisco, and he will then forward the letter 'to Mr. Mackay, or make known to him by wire the contents of your letter. When I know whether they accept or decline your offer, I will advise you further in the matter.' On April 4th Mr. Lyman addressed the following letter to the plaintiff: 'Your letter to Mr. Mackay, dated 28th of March, has been received, and its contents have been fully noted and considered. Your proposition is fully understood and satisfactory, with the exception of one point, which is open to doubt, and liable to be construed in more than one way, viz. the matter of your furnishing salt to us after sale of the property. I will condense the terms of the proposition, as we understand them, in this way: In consideration of the sum of $3,500 gold coin we will give you a bargain and sale deed of the land as described in the deed from Mr. W. N. Leete to the Pacific Mill & Mining Company, together with all the improvements thereon, including all the salt and other personal property of whatever character upon and connected with the Eagle Salt Works. There is now, by estimate, eight hundred and seventy-five tons of salt on the premises, more or less; provided that you will furnish and load at your own expense and charge, to the order of the Pacific Mill & Mining Company, or the Comstock Mill & Mining Company, in car-load lots in bulk at Eagle Salt Works, mill salt of like quality of that now on hand from time to time not to exceed eight hundred and seventy-five tons in all, within five years from date, at four dollars per ton. We do not obligate ourselves to order or to take any stated quantity of such salt. If these terms are satisfactory to you, please let me know, and immediate steps will be taken to have the deed and agreement made out, and to complete the transaction.' On April 5th Mr. Leete addressed a letter to Mr.

Lyman, accepting his offer in words as follows: 'Replying to yours of the 4th instant, the terms as stated in your letter are entirely satisfactory and accepted by me. I am ready. As soon as you have your deed and agreement ready, advise me, and I will come up and complete the transaction.' This ended the negotiations between the parties as to the sale. The deed from the corporation to Leete was executed April 9th, in pursuance of a resolution of the board of directors. It recites a consideration of $3,500, which was paid, and the further consideration as to the delivery of the salt as specified in the letter of Mr. Lyman. The deed is a quitclaim, instead of a bargain and sale, deed; but in all other respects it complies in terms with the result of the negotiations above expressed.

"The plaintiff offered evidence to show what action had been taken by him to recover the money from the government that had been paid into the land office upon the application for a patent, and what steps were taken by the corporation, and the transactions and correspondence between the parties in that regard. The defendant admitted that it had applied to the government for the sum of $3,200, and had received the money; that plaintiff had demanded the money from it, and payment had been refused; but interposed objections to all this class of testimony upon the grounds that it was irrelevant and immaterial, unless some new consideration was shown; the contention on the part of defendant being that the rights of the parties were fixed by the correspondence with reference to the sale. The plaintiff admitted that there was no new consideration, but contended that the subsequent transactions corroborated and made clear the fact that the parties dealt with each other on the basis that the money in the United States treasury was an element of consideration in the sale of the Eagle Salt Works to the plaintiff by the defendant. The court declined to pass upon the admissibility of this evidence, but admitted it subject to the objections, which would be considered and disposed of in the determination of the case. Mr. Leete employed Britton & Gray, at Washington, to collect this money from the government, and was informed by them that there was a law which prohibited the assignment of an account against the United States treasury, and that it would be necessary for him to proceed in the name of the corporation defendant, as the title to the property was in it at the time of the cancellation of the entry, in 1890, and requested him to get a power of attorney from the corporation authorizing them to act for it in obtaining the money for him. There was considerable correspondence and several interviews between the parties on this subject. The first was a letter from Mr. Leete to Mr. Lyman, dated July 31, 1895, as follows: 'I want to try and collect from the government the money I paid on application to enter the Eagle Salt Mine claim in February, 1877. To that end I have employed Britton & Gray, attorneys, who did my business in 1877. They advise me that, under the law and usages of the land department, it is desirable to have a power of attorney from the Pacific Mill & Mining Company, also our joint application from them for repayment of the Van Gorder interest, as they held that interest from about 1879 to cancellation of the entry (1890), and until conveyed to me. I inclose you the papers that Messrs. Britton & Gray have sent me to be executed by the Pacific Mill & Mining Company. Kindly please have them executed, and return to me. I will file with the papers a correct abstract of title from the county recorder of Churchill county.' Some time after this Mr. Leete discussed the matter with Mr. Lyman in San Francisco. From their conversation Mr. Leete understood that Mr. George R. Wells was the attorney for the corporation; but, as a matter of fact, he was only the vice president of the corporation. Lyman accompanied Mr. Leete to Wells' office, and introduced him, and then retired. Mr. Leete testified that Mr. Wells then said to him: 'Our company has not a cent's interest in this matter, and, if we execute a power of attorney to Britton & Gray to proceed in our name, they will presume that we are involved in an obligation to pay their attorney's fees. If you will get Britton & Gray to address us a letter disavowing any claim on us for their services as attorneys, we will execute the power of attorney asked for.' Mr. Wells testified that this statement was substantially correct, except it leaves out the word 'if;' that what he said was, 'If our company has not a cent's interest,' etc. Mr. Leete wrote to Britton & Gray, and they returned a letter to the secretary of the defendant that 'we have no present or prospective claim upon the Pacific

Mill & Mining Company for payment for our services in this matter.' Upon receipt of this communication, Mr. Leete forwarded the same to George R. Wells in a letter dated August 27, 1895: 'I am this day in receipt of the inclosure from Britton & Gray addressed to L. C. Fraser, secretary of the Pacific Mill & Mining Company, disclaiming any claim on you for services in the case. I send it to you, as I have never met Mr. Fraser. Please have the two papers executed properly and sent to me, to wit, the power of attorney, also the application for repayment of purchase money. Under the statutes of the United States in such cases as this, we have to proceed in this manner. * * * P. S. If you pay out any money for notary services, I will refund it.' Thereafter the corporation, at a meeting of the board of directors, regularly authorized the power of attorney, as prepared by Britton & Gray, to be executed, and it was duly executed and sent to Mr. Leete, who forwarded the same to Britton & Gray; also the application for repayment of the money. On August 29, 1895, the secretary, in reply, wrote Mr. Leete as follows: 'Inclosed please find power of attorney, signed and acknowledged, Pacific Mill & Mining Company to Britton & Gray; also an application, et cetera, signed by the company. Please send me your check for $5, expenses incurred notary's fees and recopying power of attorney, et cetera.' The plaintiff paid the bill for expenses. The following letter from Leete to Britton & Gray, dated September 5, 1895, shows the steps that were taken by Mr. Leete: 'In the matter of the application for repayment of purchase money paid on entry of Eagle Salt Mine, also called "Eagle Salt Works," certificate No. 170, Carson City, Nevada, bearing date 26th February, 1877, I have this day filed with the register, United States land office, Carson City, Nevada, the following papers, to wit: Abstract title Eagle Salt Works; certificate certified by recorder Churchill county, Nevada; affidavit of B. F. Leete; loss of the receiver's duplicate receipt; power of attorney Pacific Mill & Mining Company to Britton & Gray; power of attorney Benjamin F. Leete to Britton & Gray; application for repayment of the purchase money by Pacific Mill & Mining Company; application for repayment of the purchase money by Benjamin F. Leete.' In connection with this matter, Mr. Leete, on February 6, 1896, addressed the following letter to 'Pacific Mill & Mining Company, John W. Mackay, President': 'Nineteen years ago I applied to enter the Eagle Salt Works land and paid for the land. The Pacific Mill & Mining Company owned the property in 1890. The land department canceled the entry. Last April I purchased the property from the Pacific Mill & Mining Company. There is a law of the United States prohibiting the assignment of a claim against the treasury. It is therefore necessary to present a claim for the repayment of this land money in the name of Pacific Mill & Mining Company. The department wants a quitclaim deed to the government, and the warrant on the treasury will issue in the name of Pacific Mill & Mining Company. I want the warrant indorsed to me by the Pacific Mill & Mining Company. Please order these papers executed and sent to me.' No reply to this letter was ever received. Thereafter the power of attorney executed by the defendant to Britton & Gray was revoked by the order of the board of directors, and an order passed for the execution of power of attorney to H. C. King, and under that power King collected the money from the government, and paid it over to the defendant. The following letters from the commissioner of the general land office to the register and receiver at Carson City were offered in evidence by the defendant, the first dated September 17, 1895: 'Referring to your letter of the 5th instant, transmitting the application of B. F. Leete for repayment of purchase money paid on mineral entry No. 170 for the Eagle Salt Works. * * * I have to inform you that this entry was canceled by office letter "M," November 7, 1890. The abstract of title submitted with said application shows that at date of cancellation the title to this land, under mineral entry No. 170, was in the Pacific Mill & Mining Company, and hence Mr. Leete was not the proper party to make application for repayment. 14 L. D. 140. The application is accordingly denied.' The second letter, dated December 7, 1895, reads as follows: 'Referring to letter "N," September 17, 1895, denying the application of B. F. Leete for repayment of purchase money paid on mineral entry No. 170, you are advised that, as no appeal was taken from said decision within the period allowed, the case has this day been closed.'

"Testimony was offered on behalf of defendant that Mr. Wells, the vice presi-

dent, Mr. Fraser, the secretary, and Mr. Walsh, a director, of the defendant, did not have knowledge of all the facts at the time defendant gave the power of attorney to Britton & Gray. The general character of this testimony is to the effect the board of directors did not have before them at the time they authorized the power of attorney to be executed to Britton & Gray any of the correspondence 'between Mr. Lyman and Mr. Leete that led to the sale of the property,' and acted upon the representation made by the vice president. The vice president, Mr. Wells, with reference to the conversation between himself and the plaintiff and as to what was considered at the time the power of attorney to Britton & Gray was authorized, testified that Mr. Lyman brought Mr. Leete to him, and introduced him, 'and, as addressing me in the absence of Mr. Mackay, he said: "You are the vice president of this company, and Mr. Leete wants to get some money," or "Mr. Leete will explain to you what he wants." He only stayed a minute,   *   *   *   and left Mr. Leete and I together.   *   *   * Mr. Leete said there was some amount of money ($3,200)—I did not burden my mind with the amount—that was coming to him, because he had paid it on some land for which the application had been canceled, and he would like to have the company assist him to get what belonged to him. I said I would be glad to do anything I could. He explained what his claim was,—by reason of a purchase made some years ago. It was money coming from the United States. Q. Did you at that time, or had you ever before at any time, seen a correspondence between Mr. Lyman and Mr. Leete with reference to this? A. I never had.   *   *   * It was a California corporation, held property in the state of Nevada, and most all the business was transacted through its officers. I knew very little about the affairs of the company. Q. Were you present at the meeting of the board of directors in which those resolutions were passed making a power of attorney to Britton & Gray? A. Yes. Q. Upon whose representation, if any one's, was that action taken? A. I acted principally in the matter, because I took it for granted what Mr. Leete told was true. That was a corporation that had been a big corporation years and years ago, but done very little lately,—a sort of winding it up, and I had lost most all interest in it. Q. Did Mr. Leete present to you any papers at all in connection with the negotiations he had with Mr. Lyman? A. No. The only thing that I was emphatic about was this: He said he wanted to get a power of attorney, and produced a letter (from Britton & Gray)   *   *   * in which they said, in order to act, it would be necessary to get a power of attorney from the Pacific Mill & Mining Company, because at the time the entry was canceled the owner must receive the money. That was the ground upon which he explained it to me, and was the ground upon which action was called for by the Pacific Mill & Mining Company. The only thing I recall,   *   *   * and which I heard Mr. Leete use my words (and he used almost the words I used),   *   *   * I said, "If we have no interest in this property, and are going to help you, it must be distinctly understood we will incur no obligation by reason of their work as attorneys," and he said, "Well, I will see to that, and get a letter from them." I did not say, "We have no interest," because I did not know it. I was taking his statement to me as true. We must be protected from any claim, because I did not want the company to pay a bill for Mr. Leete's work.' Upon cross-examination he stated that he knew the transaction between Mr. Leete and the Pacific Mill & Mining Company had resulted in the purchase of the Eagle Salt Works property by Mr. Leete, and knew that that transaction had been negotiated between Mr. Lyman and Mr. Leete; that Mr. Lyman was the executive officer in the state of Nevada, and attended to that business, and he always accepted what Mr. Lyman said as conclusive in regard to it; that when Mr. Lyman brought Mr. Leete into the office he thought it was perfectly satisfactory that he should carry out Mr. Leete's desire; that he supposed that Mr. Leete was the owner of the money and entitled to get it; that he was perfectly willing to help him get it, provided the company would not incur indebtedness; that Mr. Leete told him he had paid the money in a transaction long ago, and since then had bought the property, and was entitled to the same."

W. E. F. Deal and Edmund Tauszky, for plaintiff in error.
J. D. Goodwin, for defendant in error.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge. The question to be determined is, which of the parties is entitled to the money repaid by the government? It appears that the defendant in error (plaintiff in the court below) was an original locator of the land, and paid the government its price for the same. He thereafter sold his interest, and his grantee in turn sold to the plaintiff in error. While the land was in its possession, the government canceled the patent previously issued therefor, but no attempt was made to obtain a return of the purchase price by the plaintiff in error. A few years later the defendant in error bargained for the property and purchased it. He then attempted to recover from the government the original purchase price, and found it necessary to collect it through the plaintiff in error, his grantor, as it was the owner of the property at the date of cancellation of the patent. He asked its assistance, and it was at first given, but later revoked, and the money collected by plaintiff in error for its own use and benefit. To enable the plaintiff in the court below to recover this money from the defendant, it was necessary for him to show that there was an agreement or understanding between them, at the date of the deed from defendant to plaintiff in 1895, that plaintiff should have the money upon its collection from the government, and that the right to the recovery of this money was an element of consideration in his purchase of the land. There was no specific agreement in writing in regard to the transaction, and the language of the correspondence must be the guide in determining the nature of the understanding of the respective parties. The oral evidence related principally to the acts and conduct of the parties subsequent to the execution of the deed, and, as tending to show the understanding of the parties at the time the deed was executed and delivered, it was admissible. The correspondence shows that early in the negotiations the defendant in error claimed to be the owner and entitled to one-half of the money in the hands of the government, whether he purchased the property of plaintiff in error or not. It is also shown that the plaintiff in error knew that this money could be recovered from the government, and, when defendant in error asserted his right to one-half of it, no denial was made by plaintiff in error of this right. In the further negotiations, resulting in an offer by defendant in error and its acceptance by plaintiff in error, no mention was made of this money. Plaintiff in error did not assert any claim to this money for itself at this time, and, in fact, after the transaction was closed and title had passed to the defendant in error, the plaintiff in error regularly executed a power of attorney to the attorneys of defendant in error for the express purpose of assisting the defendant in error to collect the amount for himself. It was only upon being advised that the land department required a quitclaim deed from it, and that the warrant on the United States treasury would issue in the plaintiff's name, that it revoked this power of attorney, and proceeded to the collection of the money independent of the claims or rights of defendant in error.

Plaintiff in error claims that it was induced to make the power

of attorney by the representations of defendant in error as to his ownership of the money, and was then in ignorance of its legal rights. It is true that parties acting in ignorance of their rights are protected by the law from imposition and deceit; but the facts show that defendant in error did not deceive or impose upon plaintiff, as, at the very outset of the negotiations, he stated his claim of an interest in the money held by the government, and immediately, upon receiving a deed to the interest of plaintiff in error, proceeded to the collection of the entire amount. The presumption is warrantable that, had the statutes permitted an assignment of an account against the United States treasury, the defendant in error would have recoverd the money from the government without objection from the plaintiff in error. "The doctrine is settled that, in general, a mistake of law, pure and simple, is not adequate ground for relief. Where a party with knowledge of all the material facts, and without any other special circumstances giving rise to an equity in his behalf, enters into a transaction affecting his interests, rights, and liabilities, under an ignorance or error with respect to the rules of law controlling the case, courts will not, in general, relieve him from the consequences of his mistake." 2 Pom. Eq. Jur. § 842. A leading case under this rule, and illustrating its reasons, is Bilbie v. Lumley, 2 East, 469. In this case an insurer, with knowledge of all the facts which relieved him of his liability on a policy of insurance which he had signed, but in ignorance of the legal rights resulting from those facts, paid the amount he had insured, and afterwards he brought an action to recover back the money as paid under a mistake. The court held that the action could not be maintained. Lord Ellenborough said:

"Every man must be taken to be cognizant of the law; otherwise, there is no saying to what extent the ignorance might not be carried. It would be urged in almost every case."

Had the defendant in error been able, under the laws of the United States, to collect the money in controversy from the government upon the power of attorney executed by the plaintiff in error, the latter would not, under the doctrine of this case, have been able to recover it from the defendant in error. This being so, it is not perceived how a statute of the United States relating to the assignment of claims against the government, and designed only for the protection of the latter, can so change the rights of the parties as to give the plaintiff in error a right to the fund which it did not otherwise possess or have a legal right to enforce. Under the facts as disclosed by the testimony, the plaintiff in error should undoubtedly be considered as having acquiesced in the claim of defendant in error to the money at the time the deed was executed by plaintiff in error, and also when it executed and gave to him the power of attorney to collect for himself the money from the government. The minds of the parties met in the fulfillment of their agreement or contract on these two occasions, and the plaintiff in error is estopped from denying that understanding later, upon the discovery that it had possessed certain legal rights of which it had not availed itself. Having allowed the defendant in error to act upon the understand-

ing had by both parties, the plaintiff in error cannot now deny that understanding, to the loss or injury of the defendant in error. Storrs v. Barker, 6 Johns. Ch. 166; Mississippi Coal & Ice Co. v. The Ottumwa Belle, 78 Fed. 643; Illinois Trust & Savings Bank v. City of Arkansas City, 40 U. S. App. 257, 22 C. C. A. 171, and 76 Fed. 271; Smiley v. Barker, 55 U. S. App. 125, 28 C. C. A. 9, and 83 Fed. 684; Markham v. O'Connor, 52 Ga. 183; Cunningham v. Patrick, 136 Mo. 621, 37 S. W. 817. "The vital principle [of estoppel in pais] is that he who by his language or conduct leads another to do what he would not otherwise have done shall not subject such person to loss or injury by disappointing the expectations upon which he acted. Such a change of position is sternly forbidden. It involves fraud and falsehood, and the law abhors both." Dickerson v. Colgrove, 100 U. S. 578; Fetter, Eq. §§ 21, 22. "Equitable estoppel, in the modern sense, arises from the conduct of a party, using that word in its broadest meaning as including his spoken or written words, his positive acts, and his silence or negative omission to do anything. Its foundation is justice and good conscience." 2 Pom. Eq. Jur. § 802. "The doctrine seems to be established by authority that the conduct and admissions of a party operate against him in the nature of an estoppel, wherever, in good conscience and honest dealing, he ought not to be permitted to gainsay them. Thus negligence becomes constructive fraud, although, strictly speaking, the actual intention to mislead or deceive may be wanting, and the party may be innocent, if innocence and negligence may be deemed compatible. In such cases the maxim is justly applied to him that, when one of two innocent persons must suffer, he shall suffer who by his own acts occasioned the confidence and loss." Stevens v. Dennett, 51 N. H. 324. In view of these established principles of law, which appear to be applicable to the conduct of the plaintiff in error in this transaction, we are of the opinion that the money refunded by the government and collected by the plaintiff in error belonged of right to the defendant in error. The judgment of the lower court is therefore affirmed.