## TREAT et al. v. ELLIS.

(First Division. Juneau. November 11, 1920.)

No. 879. Third Division.
No. 1951-A. First Division.

1. Specific Performance ☞39—Contracts.

Before an oral contract for the conveyance of land will be specifically enforced, the contract must possess all the elements and features necessary to the specific enforcement of any agreement, except the written memorandum required by statute, and it must be clear, certain, distinct, just, reasonable, and mutual in all its parts, and if it be wanting in any of these essentials it cannot be enforced.

☞See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**2. Specific Performance ⬤➡38—Contracts.**

Before a court of equity will specifically enforce an oral contract, it must be perfectly fair in all its parts, free from any misrepresentation or misapprehension, fraud or mistake, imposition, or surprise; not an unconscionable or hard bargain.

**3. Specific Performance ⬤➡52—Fraud—Mistake—Evidence.**

Mistakes with respect to his own private legal rights and liabilities may be properly regarded, as in great measure they really are, and may be dealt with as mistakes of fact. Such mistakes, even though complainants may have done nothing to induce them, may be proved in defense, and may defeat a specific performance.

**4. Specific Performance ⬤➡50—Fraud—Mistake—Contracts.**

In suits based on fraud or mistake, the inadequacy of consideration will be considered in conjunction with other inequitable circumstances. The weight of each circumstance is greatly increased by its conjunction with the other; and such circumstances are often of decisive influence in determining the unfairness of the contract, and such circumstances are undue influence, ignorance of one's legal rights, or a marked inequality of the parties.

**5. Specific Performance ⬤➡46—Statute of Frauds—Possession.**

Where possession under an oral contract is relied on to take the case out the statute of frauds, the possession ·that is required must be visible, open, notorious, and exclusive; for it is the taking of that kind only of possession which might lay the grantee in the oral contract "liable to an action for trespass." A mere symbolical or constructive change of possession will not suffice, for that would not lay trespassers liable to an action for trespass.

**6. Specific Performance ⬤➡47—Statute of Frauds—Improvements and Expenditures.**

Where improvements and expenditures of money on the property are relied on to take the case out of the statute of frauds, it must appear that the loss of the improvements would be a sacrifice to the purchaser. If, therefore, he has gained more by the possession and use of the land than he has lost by his improvements, or if he has been fully compensated for the improvements, they will not be available to him as a ground for specific execution.

**7. Specific Performance ⬤➡121(1)—Evidence—Contract.**

To obtain specific performance of an oral contract for the purchase of land, the proof must be clear, definite, and conclusive, and must show a contract leaving no jus deliberandi, or locus pœnitentiæ. It cannot be made out by hearsay, or evidence of the declarations of a party to mere strangers to the transaction, in chance conversation, which the witness had no

⬤➡See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

reason to recollect from interest in the subject-matter, which may have been imperfectly heard, or inaccurately remembered, perverted, or altogether fabricated; testimony, therefore, impossible to be contradicted.

This cause is No. 879 of the District Court for Alaska, Third Division, and is between George C. Treat, Edmund Smith, and Logan Archibald, plaintiffs, and H. E. Ellis, defendant. The parties had had a previous litigation in said court, that litigation being cause No. 721 therein. That case was decided in the lower court in favor of plaintiffs herein, but on appeal to the United States Circuit Court of Appeals, Ninth Circuit, was reversed and dismissed. 236 Fed. 120, 149 C. C. A. 330.

This suit was brought in the District Court in the Third Division, and on a plea of res judicata was dismissed by the judge in that division. It was then appealed to the United States Circuit Court of Appeals, Ninth Circuit, where it was distinguished from the former case, the action of the lower court reversed, and the cause remanded, with instructions to overrule the plea of res judicata and proceed with the trial. 253 Fed. 484, 165 C. C. A. 196.

This cause was then transferred to this branch of the court, and came on for trial on the evidence and briefs of counsel duly filed herein.

The complaint, filed herein on the 8th day of February, 1917, alleges: (1) That on the 5th day of June, 1909, defendant was the sole owner of certain mining claims. (2) That said claims were undeveloped and unimproved, and their value could only be determined by the expenditure of large sums of money, and that plaintiffs Smith and Treat, together with the defendant Ellis, did expend large sums of money and performed a large amount of labor in the exploration and development and improvement of the claims. (3) That on said 5th day of June, 1909, defendant, being indebted to Smith and Treat in the sum of $800, which said sum of $800 was secured by a lien on said claims in favor of said Smith and Treat, and the said Smith and Treat also having an equitable one-fifth interest in and to said mining claims, "which said equitable interest was evidenced by a contract dated July 9, 1908," did then and there orally agree with said Smith and Treat that he would grant and convey

to said Smith and Treat an undivided one-fifth interest in and to all of said mining claims, and that said Smith and Treat agreed that they would cancel the said indebtedness of $800 and release the defendant from any liability to pay the same, and would discharge the said lien and equitable interest which they then held against said mining claims. That thereupon, and immediately after the performance of said contract by the said plaintiffs Treat and Smith, defendant delivered possession of said mining claims to said Treat and Smith jointly with the said defendant, and that said plaintiffs then and there went into possession of said mining claims jointly with the defendant under said oral contract, and have been ever since and now are in the joint possession with said defendant under said contract. (4) That said Treat and Smith, during the time they have been in possession jointly with the defendant, have aided and assisted him in making extensive and permanent improvements on said mining claims, and in purchasing tools which have been and are now used in the development of said mining claims, all at a cost and expense of fully $50,000, of which sum said plaintiffs paid one-fifth. (5) That during the time they have been in possession of said claim jointly with the defendant said Treat and Smith have paid more than $250 as a cost and expense of preserving the property and in protecting the title to said property. (6) That plaintiffs during such time have paid their pro rata share of the cost and expense of making a permanent survey of said mining claims, for the purpose of enabling them and the defendant to secure patent thereto, which said pro rata of expense is in excess of $200. (7) That defendant has acknowledged that Treat and Smith were the owners of an interest in the claims by joining Smith and Treat in a conveyance or lease of said claims. (8) That since the 5th of June, 1909, defendant has held the naked legal title to said undivided one-fifth interest, but has held it in trust for the plaintiffs. (9) That on the 3d of January, 1913, plaintiff Logan Archibald purchased from Smith an undivided one-half of Smith's interest and to that extent succeeded to the rights of Smith. (10) That defendant, in fraud of the rights of the plaintiffs, refused to deed or convey to the plaintiffs any interest whatsoever in said claims. (11) That since August 15, 1915, defendant has been operat-

ing and working said claims, and has extracted a large amount of gold, of the value of $100,000, but has failed, neglected, and refused to account to plaintiffs for their interest. (12) That plaintiffs have no speedy, adequate, or complete remedy at law.

The prayer of the complaint is for judgment against the defendant to the effect (1) that the plaintiffs are the owners of an undivided one-fifth interest in the mining claims; (2) that defendant "be compelled to specifically perform said oral contract of June 5, 1909, by making, executing and delivering to plaintiffs a valid deed of conveyance;" and for an accounting, and for other and further relief.

On June 7, 1917, the defendant filed his answer to the complaint, in which he admits that on the 5th of June, 1909, he was indebted to Treat and Smith in the sum of $500, and no more, and that they at that time had a valid and subsisting lien upon said mining claims as security for the payment of such indebtedness; denies that on the 5th day of June, 1909, or at any other time, the defendant entered into a contract, oral or written, with Treat and Smith, or either of them, by which he was to convey to the plaintiffs any interest whatsoever in and to said mining claims, alleging affirmatively that he did on that day make a contract with A. J. Crane, wherein he agreed to lease said property to said Crane for a period of six years, and that in the negotiations leading up to said lease plaintiffs Treat and Smith proposed that, if the defendant would execute said Crane lease or option to lease, they, the plaintiffs Treat and Smith, would accept in full payment of all their claims and demands by them held against the defendant 15 per cent. net out of the royalty to be derived from said proposed Crane lease, and that such offer was agreed to and accepted by defendant, and the said Crane contract executed by him, and that thereupon the said plaintiffs Treat and Smith released the defendant from any and all debts and obligations whatsoever for the consideration aforesaid; denies the allegations as to any possession of the mining claims by the plaintiffs Treat and Smith; denies that Treat and Smith ever aided or assisted in making extensive, or any, improvements on the property, or in purchasing tools; denies that said plaintiffs have advanced any sums of money whatsoever in payment of legal expenses or

for the protection of the title, and alleges affirmatively that the said plaintiffs Treat and Smith have received their 15 per cent. per annum of the royalties derived from said lease; denies that defendant has at any time, or by any instrument, stated or declared that the plaintiffs were the owners of an undivided one-fifth interest in or to said mining claims, but alleges affirmatively that he did sign a certain instrument of lease, the introductory part of which contained a designation of himself as the owner of "four-fifths," and of the plaintiffs Treat and Smith as "each owning 10 per cent." of said mining claims, and alleges in explanation thereof that said contract was entirely prepared by one of the plaintiffs, to wit, Edmund Smith, who was an attorney at law and was then acting as such for the defendant, and counseling and advising him in all matters pertaining to said mining claims, and that at the time of, and before, the signing of said lease or instrument defendant objected to the language in said instrument purporting to state ownership of any portion of said property in Treat or Smith, but he was informed by the plaintiff Smith that such phrasing and wording was not intended to convey an idea of ownership of plaintiffs Treat and Smith, but was necessary for the reason only that the said Smith would be thereby better enabled to represent the interests of the defendant in the capacity of defendant's attorney during the then proposed absence of the defendant; denies that he holds the legal title in trust as to any legal part thereof for Treat or Smith; denies that either of the plaintiffs have any lawful claim against him for any interest in or to any of the claims; admits the refusal by defendant to convey any part of the claims to Treat or Smith, but denies that such refusal is in fraud of the rights of plaintiffs.

The answer affirmatively pleads (1) that this action is barred by the statute of limitations; (2) that the complaint fails to state any equity; (3) that the action is barred by the statute of frauds; (4) that the matter is res judicata, having been made such by the decree of the court dismissing cause No. 721. There is attached to the answer copies of all the pleadings in cause 721.

The reply denies the allegations of the answer to the effect that the 15 per cent. net royalty was agreed by Treat and Smith to be received in full for all their claims against

the said mining property, admitting, however, that they were
to receive 15 per cent., and alleging that such percentage was
to be considered as payment in full of 20 per cent. of the
royalty, which said 20 per cent. would have accrued to them
as the owners of one-fifth of the property; and alleging in
this connection that their agreement to accept 15 per cent.,
instead of 20 per cent., was in the nature of an inducement
to defendant to join with the plaintiffs in making said lease
to the said Crane; denies that the action of the defendant in
signing the conveyance or lease of the property, wherein it
was stated that defendant was the owner of only 80 per cent.,
and that plaintiffs were the owners of 10 per cent. each, in
said property, was induced by any advice or counsel given
to him by the said Edmund Smith, and denies that at said
time said Edmund Smith was the attorney or counselor or ad-
visor of said defendant Ellis.

As to the affirmative plea of the statute of limitations, the
reply denies the allegations of fact made therein. As to the
affirmative plea of res judicata, the reply admits that the
parties in cause 721 are the identical parties to this suit, but
denies that said cause 721 involved or concerned the mat-
ters or things involved in this action, and denies that the
matters and issues presented in this action were pleaded or
determined, or could have been pleaded or determined, in
said cause 721.

Donohoe & Dimond and E. E. Ritchie, all of Valdez, and
Lyons & Orton and Smith, Chester & Worthington, all of
Seattle, Wash., for plaintiffs.

L. V. Ray, of Seward, and Maurice D. Leehey, of Seattle,
Wash., for defendant.

JENNINGS, District Judge. The cornerstone of plain-
tiffs' case is the assertion in the fourth paragraph of the
complaint that on June 5, 1909, an oral agreement was en-
tered into between plaintiffs and defendant, whereby the
plaintiffs were to release defendant from certain alleged indebt-
edness and were to extinguish and discharge certain alleged
liens and equitable interests on and in certain mining prop-
erty belonging to defendant, and defendant, in considera-
tion thereof, was to convey to plaintiffs a one-fifth interest.

in said mining property—plaintiffs now seeking to compel such conveyance.

Before an oral contract for the conveyance of land will be specifically enforced—

"the contract must possess all the elements and features necessary to the specific enforcement of any agreement except the written memorandum required by the statute." 4 Pomeroy's Eq. Jurisp., note 1 to § 1409, p. 2780.

And it must be—

"clear, certain, definite, just, reasonable, and mutual in all its parts, and if it be wanting in any of these essentials it cannot be enforced." Wagonblast v. Whitney, 12 Or. 83, 6 Pac. 399, decided before June, 1900.

*The Debt to Smith and Treat*—(Plaintiffs' Exhibit A, Dated May 15, 1907, P. R. p. 95.)

Smith and Treat jointly advanced to Ellis $500, to be used in getting out ore from Ellis' mining claims and shipping it to the smelter. This was a straight money loan (of a speculative nature, however, dependent on the amount of the returns from the smelter), but nevertheless the money advanced was secured by a lien called "mortgage" on the mining property.

There is nothing to indicate that this money was advanced under an agreement that Smith and Treat were to obtain any interest in the mining claims, nor with the expectation or even the hope on their part that they were to obtain such an interest.

The smelter returns being insufficient to liquidate the debt, the relation of debtor and creditors between Ellis on the one side and Smith and Treat on the other continued until June 9, 1908. There is no evidence of any work having been performed by and through the money advanced by Smith and Treat, except the getting out of ore and the shipment of same to the smelter in accordance with said advance of $500.

On the last-mentioned date the parties entered into the incorporation contract. Plaintiffs' Exhibit D, dated June 9, 1908, P. R. p. 104. "Mr. Ellis wanted to improve and develop the property, and we were anxious to get our money, so various methods were suggested, which finally resulted in the drawing" of another contract. Testimony of Smith, P. R. p. 103.

Accordingly, on June 9, 1908, a contract was entered into by which Ellis agreed to form a corporation and to deed his claims to that corporation in consideration of all its stock, then to transfer 20 per cent. of that stock to Smith and Treat, and 20 per cent. to the treasury of the company, and Smith and Treat were to give Ellis a receipt in full for .the aforesaid debt, draw the articles, attend to the filing and recording, pay all expenses of incorporation, and devote "whatever time and attention might be necessary to the proper organization of said corporation and the sale of said stock." It would seem that this agreement to incorporate was entered into as much for the benefit of Smith and Treat as 'for the benefit of Ellis.

The contract of 1907 was abrogated—was "wiped out"— by this contract of 1908. Smith, P. R. p. 105; also A. T. p. 36. It is rather difficult to see how Smith and Treat were at any time in position to charge Ellis with any liability on this contract until they had performed, or offered to perform, or had been legally excused from performing, their part. It would be difficult, also, to construe this contract as not embracing in its terms an obligation on the part of Smith and Treat *to actually make a sale* of said treasury stock. If the intention had been that Smith and Treat were simply *to use their best endeavors to sell* the stock, the words *"give whatever time and attention might be necessary for the sale of said stock"* would hardly have been used.

Smith did prepare the articles of incorporation, and Ellis signed and duly executed them, and left them with Smith, and expressed, also in writing, his willingness and intention to do everything required of him by the contract (P. R. p. 144); but Smith and Treat never filed the articles, and never sold the treasury stock, and never receipted to Ellis, and never released the mortgage.

*The Oral Contract.*

Ellis had an opportunity to lease the property to one Crane, and after consultation, he on June 5, 1909 (after 7 o'clock in the evening, according to Smith's testimony, P. R. p. 111), came into Smith's office after an interview with Crane and said: "What interest do you expect in this property, if we carry out this lease?"

It would have been more appropriate to call whatever interest they had in anything "an interest in the transaction," not an interest in the property; but it is not hard to understand how Ellis would fall into the error or habit of thinking and speaking of Smith and Treat as having an interest in the property, for they had never canceled the mortgage, or given him a receipt for the debt, and, besides, he may have thought that the incorporation contract gave them such interest. It would seem from the bringing of suit No. 721 and from the fourth paragraph of the complaint in this case that Smith and Treat thought they had such interest, and, if they could think so, it would not be unnatural for Ellis to think the same.

According to Smith, Ellis "wanted to know if we would take our money back with big interest. I told him we would not; that we had gone into the matter in the nature of a grubstake proposition. There was nothing there at the time we put the $500 into it, and our money had performed all the work that had been done on it since that time, and we certainly would not take a chance of that kind and just accept our money back."

Smith further testifies (on page 112, P. R.) that they were anxious to get the property developed—something done with it—and that he and Treat retired into another room of the office, and after discussing the matter personally came back and stated to Ellis "what we would do." When asked what that proposition was, he said that it was:

"That we would insist upon our ownership of 20 per cent. interest in the property, but during the life of the lease we would accept 15 per cent. of the royalty, or allow Mr. Ellis to take 5 per cent. of our royalty for the purpose of compromising and securing a lease and the development of the property."

"Q. What reply did Mr. Ellis make to that? A. He said that was all right."

On June 5, 1909, then, according to the testimony of Smith, it was orally agreed that in consideration of the abandonment of the incorporation scheme Ellis would convey to Smith and Treat a one-fifth interest in the mining property. (Pages 4 and 5, A. T.) If that was the contract, it differs widely as to consideration from the contract alleged in the complaint.

Was the contract made? Ellis denies it, and in support of his denial offers a letter signed by Smith and Treat and delivered to him, of which the following is a copy:

"In answer to your inquiry as to what we would take or accept for our fifth interest in the Gold lode mining claims, located by you on North side of Valdez Bay, will say: That we will accept fifteen per cent. net of royalty on lease of property provided the contract of lease is satisfactory or we will accept twelve thousand five hundred dollars in cash net for our interest in said property." (P. R. p. 237).

It will be seen that this letter proposes that Ellis may acquire "our one-fifth interest in the Gold lode mining claims, located by you on north side of Valdez Bay," by adopting either branch of an alternative, which alternative is as follows: (1) You enter into a satisfactory lease with Crane and give us 15 per cent. net royalty; or (2) pay us $12,500. If Ellis had accepted the second branch of the alternative, and paid the $12,500, the relations between the parties would have been definitely concluded. However, he accepted the first branch of the alternative; but to this first branch plaintiffs contend there is annexed an unwritten proviso, to wit, that "we are to retain our one-fifth ownership." Plaintiffs maintain that in said letter they were submitting two propositions, one relating to the proposed lease of the property, and the other to the sale of the property, and that Ellis so understood the letter, and acted with that understanding. Smith is corroborated in a manner by Treat and Crittendon, but I do not think there is much probative force to be attached to either of those items of testimony. However, he is further corroborated by the recital of ownership in the Millard lease and by the protests to the Cliff Mining Company (Plaintiffs' Exhibits C, E, F; P. R. pp. 116, 123, 125, respectively), all of which were signed by Ellis, Smith and Treat, and in which said signers are spoken of either as "owners," or "part owners," or as "we, the undersigned, owners and lessors." These admissions weigh heavily against Ellis, and do, I think, show conclusively that Ellis so understood the letter and accepted the offer contained therein, and that he orally agreed to convey the property. It is unthinkable that a man of Ellis' intelligence, as shown in the testimony, executed said lease or signed such letters without real-

izing their full import. Smith is further corroborated by the somewhat unnatural absence of protest by Ellis against the manifest assumption of ownership by Smith and Treat contained in their letters (Plaintiffs' Exhibits J, F–1, E–1; P. R. pp. 180–183 and A. T.), both of which he received, one of which he answered in a noncommittal way, and the other of which he answered not at all.

Considering all the testimony, facts, and circumstances, the court is of opinion that Ellis orally agreed to convey to Smith and Treat a one-fifth interest.

*The Consideration for the Oral Contract.*

But is it a contract, for the specific performance of which a court of equity ought to enter a decree? While it. sufficiently appears that Ellis agreed to convey, yet "what Treat and Smith were to do, in consideration," or "whether they have done the things they agreed to do," or "whether those things have any value," does not so appear.

As to the question of the nature of the consideration and the exact terms of the contract, the record shows that plaintiffs themselves are involved in a maze of contradictory assertions and positions. In the complaint in cause No. 721 it is alleged, over the oath of Treat, that the incorporation scheme was to be held in abeyance until the expiration of the lease, and that Ellis agreed that it should then be executed *or* that he would convey. True, a portion of this complaint was stricken on motion of plaintiffs, over the objection of defendant; but that fact "cannot make that not to have been which has been"—cannot alter the fact that at the time the complaint was sworn to Treat had that understanding of the contract. Such statement of the contract is entirely at variance with the statement of the said contract as it appears in the fourth paragraph of the complaint in this action. In that fourth paragraph plaintiffs say that the consideration of the oral agreement to convey was the release of an indebtedness, cancellation of mortgages, return of notes, and the yielding up of an "equitable interest," all to be performed by them, and all of which they say they promptly performed. The evidence of Smith is entirely at variance with the allegations of both complaints, for he swears that the debt merged in the incorporation contract, and that

the oral agreement was entered into in consideration of the abandonment of the incorporation scheme. (A. T. pp. 4 and 5.)

If, as claimed in the complaint, the consideration for such oral contract was the release of an indebtedness and the extinguishment of an equitable interest in the claims, it is to be observed that Smith and Treat at that time had no debt to release and no equitable interest in the claims to forego; for by the incorporation contract they had extinguished any money demand they had against Ellis, and they had no equitable interest in the property, for the reason that the incorporation contract gave them no interest in the property, and besides, too, said contract had never been fully performed on their part, as they had never even filed the articles of incorporation, nor sold a share of treasury stock. Smith says that the main reason the articles of incorporation were not filed was "to prevent tying up the property in case some other disposition should be deemed more advantageous later on." The explanation does not explain, for when there is an opportunity to lease to Mills it is not availed of (P. R. p. 186); besides, one of the chief objects of incorporating a company is to lift the projected enterprise above the plane where it might be affected by the death, sickness, or caprice of single individuals. Smith says he next interested Crane in a lease, but the evidence is very conflicting as to whether Smith and Treat "found" Crane and then sought out Ellis, or whether Ellis found Crane and then sought out Smith and Treat. The evidence discloses the name of but one individual who was approached on the subject of taking stock, Mr. Charles Hubbard (P. R. p. 107), but what labor was involved in this futile effort does not appear. When, therefore, Ellis asked if they would take their money back with good interest, he was offering them all they had earned, and he was offering them something they could not have recovered at law.

On the other hand: If, as claimed by Smith in his testimony (A. T. pp. 4 and 5), the consideration for the oral contract to convey was the abandonment of the incorporation contract, one may lay aside all question of variance and yet be constrained to ask: What did that consideration amount to?

It is established by the testimony on behalf of plaintiffs that on June 5, 1909: (1) The prior indebtedness had been extinguished; and (2) the incorporation contract had not been performed on the part of Smith and Treat. The status, then, on that date, before the Crane option, was that Smith and Treat then had in their possession four documents, to wit: (a) Agreement of Ellis to join in the formation of the corporation; (b) articles of incorporation, duly signed and acknowledged, but not filed for record; (c) letter from Ellis to the proposed corporation, offering to convey the property; (d) mortgage by Ellis, made by the contract of 1907; while Ellis had possession of, and legal title to, the mining claims. It is not apparent that Smith and Treat parted with anything except the unfiled articles of incorporation and the benefits which might accrue to them by disposing of 20 per cent. of the treasury stock of such proposed corporation (and their ability to so dispose of said treasury stock had been shown to be of exceeding doubtfulness). It may be (although the length of time which had elapsed would be strongly against them) that at that time they had the right to file the articles and sell the stock, and that on the doing of those things they would have a claim against Ellis, if he should refuse to convey to the proposed corporation; but in that event what kind of a claim would they have? It would not be a valid claim for specific performance, and the only other shape it could take would be an action for damages.

What was the present worth—that is, the worth on June 5, 1909—of such a claim, depending, as it was, on so many contingencies of law and fact? On the other hand, on June 5, 1909, Ellis had a right to demand of Smith and Treat that they release the mortgages and all money claims against him, and at that time he had the right, also, to enter into whatever lease he wished to inter into, whether the same was or was not satisfactory to Smith and Treat, and he had the right, if he wished to, to mortgage or otherwise incumber his claims, for he never agreed to tie his hands in dealing with the property before a corporation should be formed, except to this extent, that he impliedly agreed not to part with the title to the claims; but, even so, it is not to be presumed that he meant that Smith and Treat should take whatever time they desired to form the proposed corporation and

do the things which they were to do. Ellis could fulfill his unperformed part of the incorporation contract by conveying the property to the company subject to lease or other incumbrance; but evidently he thought that Smith and Treat had some kind of a valid interest in, or claim upon, his property. Plaintiffs' letter fixes the value of their claimed one-fifth at $12,500. They say, then, in substance:

"The oral contract was that Ellis should give us property valued at $12,500, in consideration of our foregoing to go ahead with the formation of a contract and consummating a sale of one-fifth of this stock—a thing which we have not yet been able to do, although we have had an entire year in which to do it, and which (it might be added), for aught that appears, we will never be able to do—and recovering some damages in an action which we might bring."

Thus it would appear that, even under Smith's version, the consideration for the alleged oral contract, by which Ellis was to give up property worth $12,500, was of so doubtful a character and worth as to almost warrant the assertion that there was no consideration.

## Misapprehension of Ellis.

Again, if the alleged oral contract was entered into, it is clear that Ellis entertained the mistaken apprehension that Smith and Treat had some interest in the land; whereas, in truth and in fact, they had none. It is clear that he thought it was necessary at least to conciliate them before he could enter into the lease with Crane; whereas, in truth and in fact he need not have consulted them at all.

"Q. Did you at any time agree to give them any interest in the property? A. None whatever in the property. Q. Have you any exception in mind? A. I was thinking of the agreement to give them stock in the corporation." (A. T. p. 82.)

Ellis was mistaken as to his rights and liabilities.

"Mistakes * * * with respect to his own private legal rights and liabilities may be properly regarded, as in great measure they really are, and may be dealt with as mistakes of fact." 2 Pomeroy's Eq. Juris. (3d Ed.) § 849, p. 1496; also 38 Cyc. p. 607, and cases cited.

"Such mistakes, even though complainants may have done nothing to induce them, may be proved in defense and may defeat a specific performance." Id. § 860.

Speaking of *inadequacy of consideration,* in conjunction with other inequitable circumstances, the authors of Cyc. say:

"The weight of each circumstance is greatly increased by its conjunction with the other," and "such circumstances are often of decisive influence in determining the unfairness of the contract," and "such circumstances are undue influence, * * * ignorance of one's legal rights," or a marked inequality of the parties. 36 Cyc. p. 611, b.

## Conclusion as to Contract.

In my opinion, then, the contract, even if it may be considered to have been established as required by law, does not measure up to the full stature prescribed by Mr. Pomeroy in the fourth volume of his work on Equity Jurisprudence (section 1409, 3d Edition), to wit:

"It must be perfectly fair in all its parts, free from any misrepresentation or misapprehension, fraud or mistake, imposition or surprise; not an unconscionable or hard bargain."

## Part Performance—Statute of Frauds.

There are some other matters, also, which in my opinion call for the dismissal of the bill.

Our statute was taken in June of 1900 verbatim from the Oregon statute, and is as follows:

"Sec. 1878. [C. L. A. 1913.] No estate or interest in real property, other than a lease for a term not exceeding one year, nor any trust or power concerning such property, can be created, transferred, or declared otherwise than by operation of law, or by a conveyance or other instrument in writing subscribed by the party creating, transferring, or declaring the same, or by his lawful agent under written authority, and executed with such formalities as are required by law.

"Sec. 1879. The last section shall not be construed to affect the power of a testator in the disposition of his real property by a last will and testament nor to prevent a trust arising or being extinguished by implication or operation of law, nor to affect the power of a court to compel specific performance of an agreement in relation to such property."

The Supreme Court of Oregon, in an opinion filed March 17, 1885, in the case of Wagonblast v. Whitney, supra, said:

"The ground of the jurisdiction is equitable fraud. It is based upon the just principle that when acts of past performance have been done in pursuance of and in reliance on the verbal contract, with the knowledge and consent of the other party, *and the relations of the parties are so changed by reason thereof as to prevent*

6 A.R.—20

*a restoration to their former condition,* it would be a fraud and encourage bad faith to permit the statute to be interposed as a defense whereby one party would reap the benefit of the acts of part performance, and the other be left without any remedy, and liable for damages as a trespasser. * * * But to authorize equity to interfere, and enforce the specific performance of a parol agreement for the sale of land upon the ground of part performance, it must contain all the elements of a binding obligation, and necessary to the enforcement of any contract, except the written memorandum required by the statute. *Such contract, to be specifically excluded, must be clear, certain, definite, just, reasonable, and mutual in all its parts, and if it be wanting in any of these essentials it cannot be enforced.* Nor is it sufficient that a specific contract be alleged, *but it must be clearly and satisfactorily proved in* order to take it out of the statute by part performance. * * * Nor will the specific performance of a parol contract be granted, unless it be proved in the clearest manner and substantially the same contract as set out in the bill. * * * These are salutary but stringent rules, in the observance of which the interests of society and the public welfare are involved. A party is presumed to know the requirements of the law, and that a contract for the sale of land must be in writing. When he asks a court of equity to interfere, and save him from the consequences of his disregard of the law, the burden of proof is rightfully thrown upon him to show a case outside of the operation of the statute. The court will not interfere to protect his rights, and lend its aid to the enforcement of a contract depending upon parol evidence and part performance, unless he proves the existence of the contract, its terms, and the acts of part performance by clear, satisfactory, and indubitable proof."

Assuming that the oral contract is sufficiently proved, and was such as to call for the interposition of equity if the contract was part performed, there would remain to be considered the question as to whether or not the acts of part performance relied upon were of that quality necessary to obtain in order to warrant the court in decreeing specific performance in disregard of the plain letter and spirit of the statute of frauds?

In the consideration of this question we should, I think, bear in mind how it came about that the chancellors made bold to practically nullify in some instances a positive statutory enactment, and what some of the courts of this country have seen fit to say on the subject.

In a valuable note found on page 790 of 3 L. R. A. (N. S.) it is stated that—

"The idea that one who had gone upon land under an oral contract might be driven off as a trespasser, if he could not take refuge

behind his agreement, is the main support of the English doctrine
of part performance, and of the rule that possession alone is suf-
ficient to answer for the writing required by the statute."

And then is added the following:

"That it was necessary to break the statute to such an extent to
shield the party in possession from the pains and penalties which
might follow a trespass has been doubted."

And it is further stated that many of the courts of America
have held that the reasoning required to sustain the doctrine
of the English courts is faulty, the author citing many deci-
sions in support of his statement, among them the case of
Ann Berta Lodge No. 42, I. O. O. F., v. Leverton, 42 Tex.
18, where the court comments as follows:

"But is there in fact any necessity to enforce a contract in vio-
lation of the plain letter of the law to afford the purchaser pro-
tection against such suits, which, no doubt, in equity and good con-
science he should have? To enable the purchaser to defend him-
self against such suits, it is insisted he must give in evidence
the whole contract under which he entered. Grant it. The stat-
ute does not preclude the court from hearing proof of this kind,
if presented for any legitimate purpose. It merely forbids charg-
ing the party on such contract after it is proved. And surely, if
the court can, to prevent a fraud, decree the performance of the
contract, notwithstanding the statute, it can protect the defendant
on the same ground against the consequence of acts done under it,
and at the instance of the plaintiff. Delivery of possession might
with more propriety be treated as a license to enter and enjoy the
rents and profits. And such license surely would protect the pur-
chaser against an action for trespass or rents, when the contract of
sale, through default of the vendor, has not been carried out, or
by reason of the statute cannot be enforced. This seems to us much
more reasonable and more consonant with the rule of proceeding
in equity, than to enforce the performance of the contract merely to
prevent one of the parties against damage, which otherwise he
might sustain from the failure of the other to comply with its stipu-
lations."

The author of the note goes on to say, on page 792 of the
L. R. A., supra:

"In this country the courts have been swayed for the most part
by the idea that it would be a shock to the conscience to allow
one who had put another in a hard position to throw up his con-
tract and get off under cover of the statute. The statute would
thus be aiding and abetting fraud which it was its design and pur-
pose to prevent. Under the fraud theory, pure and simple, pos-
session alone would not necessarily be a sufficient act of part per-

formance to take an oral contract relating to real estate out of the statute, since the party to whom possession had been delivered might be put back where he was before the contract, and no real loss be suffered by him as a result of the transaction. This was the possession taken in Glass v. Hulbert, 102 Mass. 25, 3 Am. Rep. 418, in which the court said that mere possession of land did not expose the party to loss, or danger of loss, without redress at law. The parol agreement of sale and purchase with permission to enter. though not to be enforced as a valid contract of sale, would constitute such a license as would protect the party from liability for acts done before the license was revoked, and for all acts necessary to enable him to remove himself and his property from the premises after such revocation. If possession were taken without such permission, express or implied, it was no. foundation. for relief in equity according to any of the authorities."

In the case of Patton v. McClure, Mart. & Y. 333, the Supreme Court of Tennessee had this to say:

"The appalling train of litigation resulting from a departure from the words of the statute in England is a solemn warning to the courts of this state not to fall into similar error; for the courts of that country now admit them to have been errors, and would most willingly return to the words of the statute, were it possible to do so consistently with the construction, but too well settled by their ancestors, which virtually repeals the act, and has given rise to as much fraud and perjury, in all probability, to bring causes within the various exceptions made by the courts, as would have arisen had the statute never been passed. Whether the statute has done more good than harm to the people of England is at this day a doubtful question."

See, also, Glass v. Hulbert, 102 Mass. 24, 43, 3 Am. Rep. 418, 434, where the Massachusetts court says:

"Notwithstanding contrary decisions and dicta, we are satisfied that, upon principle, the conveyance of land cannot be decreed in equity by reason merely of an oral agreement therefor, against a party denying the alleged agreement and relying upon the statute of frauds, in the absence of evidence of change of situation or part performance creating an estoppel against a plea of the statute. This rule applies as well to the enforcement of such an agreement by way of rectifying a deed, as to a direct suit for its specific performance. We are satisfied, also, that this is the rule to be derived from a great preponderance of the authorities."

The Supreme Court of the United States, while apparently following the decisions of the English courts, does, it would seem, "damn the principle with faint praise," for in the case of Neale v. Neales, reported in 76 U. S. (9 Wall.) 9, 19 L. Ed. 590, it said:

"The statute of frauds requires a contract concerning real estate to be in writing, but courts of equity, *whether wisely or not it is too late now to inquire,* have stepped in and relaxed the rigidity of this rule, and hold that a part performance removes the bar of the statute, on the ground that it is a fraud for the vendor to insist on the absence of a written instrument, when he had permitted the contract to be partly executed."

And the same court, in the case of Townsend v. Vanderwerker, 160 U. S. at pages 183, 184, 16 Sup. Ct. at page 261 (40 L. Ed. 383), says:

"As there was no contract in writing, plaintiff must maintain his bill, if at all, upon the theory of a part performance. He must maintain it, too, upon the same principles and with the same cogency of proof as if it were in fact, as well as in substance, a bill for a specific performance. * * * The general principle to be extracted from the authorities is that if the plaintiff, with the knowledge and consent of the promisor, does acts pursuant to and in obvious reliance upon a verbal agreement, which so *changed the relations of the parties as to render a restoration of their former condition impracticable,* it is a virtual fraud upon the part of the promisor to set up the statute in defense."

Pomeroy, in the fourth volume of his work on Equity Jurisprudence (section 1409, note 1), says that the ground of the jurisdiction is "equitable fraud," and in section 867 of the second volume of said work he uses this language:

"Equity does not deny nor overrule the statute, but it declares that fraud or mistake creates obligations and confers remedial rights which are not within the statutory prohibition." Section 867, vol. 2, same work.

In the case of Eastburn v. Wheeler, 23 Ind. 309, the court finds fault with the expression "part performance," and declares that—

"Perhaps it would be more consistent to say that, in cases where a parol agreement has induced another to do certain acts which he cannot recall, and to put himself in such a position that a fraud upon him without remedy would result unless the contract is carried into complete execution, equity will not permit the other party to take advantage of the fact that the agreement was not in writing, just as, in a variety of other cases to prevent fraud, a party will not be tolerated to assert a fact, the setting up of which is unconscionable under the circumstances."

A forcible exemplification of the assertion that the foundation of the jurisdiction is "equitable fraud," rather than any

inherent, exclusive, or indispensable virtue in the "mere taking possession and making valuable improvements," is found in the case of Sears v. Redick, 211 Fed. 860, 128 C. C. A. 238, a case where no change of possession was shown. There the court says:

"Would the application of the statute to the parol contract inflict irreparable injury upon one who has so changed his situation in reliance upon it that he cannot be restored to his original position and cannot be adequately compensated in damages at law? If it would, the contract may be enforced in equity; if it would not, it may not be sustained. Possession of the real estate under the parol contract and improvements made thereon by the vendee are evidences, but they are neither the only nor the indispensable evidences, of such a change of situation, or of such irreparable injury. There are others as effective, and there is none more so, none that appeals to the conscience of a chancellor with more persuasive, more compelling power, than the fact" in the case then being considered.

It would seem to be well established by the decisions of many American courts that to "possession and improvements" has been attributed an unjustifiable importance, and that those courts are induced to follow the English cases, not by reasoning but for "precedent's sake" alone. Certainly the doctrine ought not to be extended. 2 Beach, Eq. Juris. § 613.

If, however, it be conceded that the making of the oral contract is such, and has been established in such manner, as is required by law, and that the mere taking of possession and the making of improvements and expenditures are of themselves sufficient, without any more decided change of relations, to warrant, in all cases, a court of equity in holding any case to be without the statute, we are yet constrained to ask: What kind of possession is required to be shown, and what kind of possession is shown in this case, and also what is the nature of the improvements and expenditures which were made in the case?

*Possession.*

On June 5, 1909, at the time of the entering into of the oral contract (assuming that such contract was entered into), Ellis undoubtedly had the legal title to, and the legal and actual possession of, the entire interest in all the mining claims. When, if at all, did he transfer to Smith and Treat any part of that possession?

The contention is that they took possession by virtue of the fact that, immediately after the oral contract was made, Ellis

joined them in executing the Crane option, and later on the Millard lease; the idea advanced being that the joining by them in the option and lease, with Ellis' consent, necessarily implied that all three were in possession before the lease, and that after the lease that possession continued by virtue of the fact that their lessee was in possession. That contention cannot be sustained, if it be borne in mind that, even under the English authorities, the possession that is required must be visible, open, notorious, and exclusive; for it is the taking of that kind only of possession which might lay the grantee in the oral contract "liable to an action for trespass." Browne on the Statute of Frauds, §§ 274–278. A mere symbolical or constructive change of possession will not suffice, for that certainly would not lay Smith and Treat liable to an action, for trespass.

"The possession that will be deemed a part performance of a parol contract is an actual possession, taken by the vendee under the contract, with the consent of the vendor, and with a view to the performance of the agreement, and not the fictitious possession which the law imputes to the legal ownership when there was no actual adverse possession." Charpiot v. Sigerson, 25 Mo. 63.

In Brown v. Lord, 7 Or. 302, the court says, on page 313, that such possession must be "distinct, visible, and exclusive."

The fact that Smith and Treat joined with Ellis in signing the lease to Millard, describing themselves as the owners of one-tenth each, cannot be considered as tending to establish the fact that Ellis *transferred* to Smith and Treat *possession* under said oral contract. A lease signed by Ellis alone was all that was necessary to vest Millard with the right of possession, and although Smith and Treat joined with Ellis in signing the lease, they joined sua sponte. On page 15, A. T., Smith says that he and Treat had the same kind of possession as Ellis—that is, the only possession required of the owner of unpatented mining claims; not so, however, for Ellis' possession was that possession which the legal ownership draws to it, while Smith and Treat never had any legal ownership.

Counsel for complainants cite but one case in support of their contention that a paper possession is sufficient, and that is the case of McKay v. Calderwood, 37 Wash. 194, 79 Pac. 629, but that case simply holds that one *may* let another into

possession as a tenant in common, and that in that particular case such thing was done. In that case, however, the plaintiff went into actual possession and "reduced said lands to cultivation" at a cost of $1,085.

Contending that the mere division of rents establishes joint possession, counsel for complainants cite the case of Shearer v. Gibson, 123 Mich. 467, 82 N. W. 206. That case does not discuss the proposition at all, nor does it cite any authorities; the court contenting itself with the bare assertion that "it appears that after the contract was made the rent of the property was divided, *and* that the defendant paid a portion of the cost of improvement, so that there was a part performance of the contract, in effect a joint occupancy." But what the nature and extent of the improvement was does not appear, nor does it appear what, if any, part said improvements contributed to a "sufficient part performance"; besides, if division of the rent is to be taken as showing possession, is the interest possessed proportioned to the amounts received as rent by the parties? If so, then in the case at bar plaintiffs have possession of only a 15 per cent. interest, instead of a 20 per cent. interest which they claim, and instead of a 24 per cent. interest to which they would be entitled, if entitled at all. If the undivided interest sued for here had been paid for in cash by Smith and Treat, that would not constitute a delivery of possession. How, then, does the mere fact that royalties coming from Millard were divided constitute possession in Smith and Treat, especially when those royalties are for less than the interest claimed?

Reliance is placed by plaintiffs upon the evidence of Treat that at the expiration of the lease the lessee surrendered the possession to him, and that thus, at least, Smith and Treat came into possession. Treat's testimony to that effect is found on page 176, P. R., and is in substance to the following effect, to wit: That in the month of August, 1914, he visited the property in controversy, and that he had a letter from Mr. Millard, who was president of the company, to a Mrs. McDougall, who was at the time watchman there for the lessee, and that he delivered the letter to Mrs. McDougall, and she turned the keys over to him, and that he gave the keys to a man by the name of Hughes, saying:

"You are a friend of Red's; so am I, and we are old acquaintances, and I think I will turn the keys over to you, and you can act as watchman here for all of us; and at that time I posted some trespass notices."

The substantial part of this testimony of Treat is denied by Hughes. Hughes says that he went down there at the instance and request of Will Ellis, a brother of the defendant, who stated to him that McDougall, the man in charge, had gone to the Gold King, and he wished Hughes to go down there and keep track of it, and see that nothing was removed. He further testified that a man by the name of Minick, who had been in charge for the lessee, delivered up the keys to him, Hughes, took him around and showed him the mining equipment and all the place. He further testified that Treat came down there in company with Archibald, on the 18th of August, and was putting up some trespass notices and that he (Hughes) suggested to Treat that he ought to see Mr. Ellis before doing this, to which Treat replied that he was "just doing it out of friendship for Ellis—wanted to protect his property and warn people from trespassing." As to the transaction about the keys he says that—

"Mrs. McDougall stayed there after her husband went to the Gold King; she had some keys—in fact, almost any key would fit the little door, or fit the doors; there was quite a bunch of keys, and several of the doors were without locks, and she got an order from Col. Millard, somthing about these keys; anyway Treat handed the keys to me; I saw him pick them up there."

. Whether we believe Treat or Hughes, the testimony is entirely of too vague and unsatisfactory a nature to establish any taking of possession by Smith and Treat.

*Improvements and Expenditures.*

As to improvements and expenditures alleged to have been made by Smith and Treat, it is, I think, sufficient to say that the improvements were not placed there by complainants but by the lessee, and under the lease; and as to the expenditures, they are inconsiderable in amount. The evidence shows that Smith and Treat did not actually advance any money on that account or on account of the improvements. The fact is that the expenditures were paid by the Cliff Mining Company and the amount taken into consideration by the Cliff Mining Company in paying the royalty agreed upon. Possibly no amount

ought to have been deducted from the royalties on account of these expenditures; but, nevertheless, the parties finally agreed that the sums might be deducted and so the royalty coming under the lease was affected by just the sum deducted, and Smith and Treat got 15 per cent. of the entire royalty as agreed upon.

"It must appear, however, that the loss of his improvements would be a sacrifice to the purchaser. If, therefore, he has gained more by the possession and use of the land than he has lost by his improvements, or if he has been in fact fully compensated for the improvements, they will not be available to him as a ground for specific execution." Browne on the Statute of Frauds (4th Ed.) § 490.

In their reply brief counsel for complainants urge that a law court could not now and never could have granted the plaintiffs adequate relief—

"because the moneys advanced by these plaintiffs probably developed an unknown prospect into a paying mine. The plaintiffs, like many public-spirited men in new countries, were willing to risk their money in blazing the trails, and to say that, after risking their time and their money in such a manner, these plaintiffs can now be compensated the same as a money lender, who exacts complete security for his loan and prompt payment of the same, with interest on his investment, is not only in conflict with the rulings of the courts, but such a decision would retard the development of any country."

That argument ignores two facts: (1) That the advancing of $500 by Smith and Treat was a straight money loan, and bore no resemblance to a grubstake proposition; (2) the contract for the repayment of this $500 merged into the "incorporation contract."

*Equitable Fraud.*

Having seen that "equitable fraud" is the true foundation for the exercise of the jurisdiction of the equity court, let us proceed to ask and answer the question which the court, in the case of Sears v. Redick, supra, propounded to itself, to wit:

"Would the application of the statute to the parol contract inflict irreparable injury upon one who has so changed his situation in reliance upon it that he cannot be restored to his original position and cannot be adequately conpensated in damages at law?"

In this country—especially in this Western country—there is attached to the ownership of land no such distinction or

peculiar advantage as inhered in such ownership among our Anglo-Saxon forbears. Certainly "no such divinity doth hedge about" the ownership of a mining claim as, in the olden days, invested the proprietor of "smiling meadows and well-wooded heights" with a kind of sacrosanct character. A mining claim is usually situated in rough and inaccessible solitudes, and its only value is the mineral contained therein; that value is realized only by "marring the surface and gutting the kindly earth." There is no peculiar situation, sentimental attribute, or other consideration which gives the mining claims in question any distinctive value to any one, except perhaps to Ellis, the discoverer, who says that he always had an ambition "to discover, develop, own, and operate a mine of his own." (P. R. p. 112.)

It is shown in the proof that Smith and Treat have received $7,000 in royalties, which is a larger sum than would be required to reimburse them for their original outlay and interest. Complainants offered to sell to Ellis their interest, or supposed interest, in the mining claims for $12,500. The value of their supposed interest was not then, on June 5, 1909, undeterminable. They assert that the mining claims would be the only assets of the corporation. *It is neither shown nor alleged that Ellis is or ever was insolvent.*

In Purcell v. Miner, 71 U. S. (4 Wall.) 517, 18 L. Ed. 435, the Supreme Court of the United States said:

"A mere breach of a parol promise will not make a case for the interference of a chancellor. It is plain that a party who claims such interference has the burden of proof thrown on him. He knows that the law requires written evidence of such contracts, in order to their validity. He has acted with great negligence and folly who has paid his money without getting his deed. When he requests a court to interfere for him, and save him from the consequences of his own disregard of the law, he should be held rigidly to full, satisfactory, and indubitable proof—

"First. Of the contract, and of its terms. Such proof must be clear, definite, and conclusive, and must show a contract, leaving no jus deliberandi, or locus pœnitentiæ. It cannot be made out by mere hearsay, or evidence of the declarations of a party to mere strangers to the transaction, in chance conversation, which the witness had no reason to recollect from interest in the subject-matter, which may have been imperfectly heard, or inaccurately remembered, perverted, or altogether fabricated; testimony, therefore, impossible to be contradicted.

"Second. That the consideration has been paid or tendered. But the mere payment of the price, in part or in whole, will not, of itself, be sufficient for the interference of a court of equity, the party having a sufficient remedy at law to recover back the money.

"Third. Such a part performance of the contract that its rescission would be a fraud on the other party, and could not be fully compensated by recovery of damages in a court of law.

"Fourth. That delivery of possession has been made in pursuance of the contract, and acquiesced in by the other party. This will not be satisfied by proof of a scrambling and litigious possession."

I think the complaint should be dismissed.

---

☞See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes