**JAMES et al. v. NELSON et al.**

No. 8147.

Circuit Court of Appeals, Ninth Circuit.

June 7, 1937.

J. C. Winter, of Valdez, Alaska, for appellants.

Donohoe & Donohoe and Thomas M. Donohoe, all of Cordova, Alaska, for appellees.

Before WILBUR, GARRECHT, and MATHEWS, Circuit Judges.

GARRECHT, Circuit Judge.

On February 5, 1930, the appellants gave to the First Bank of Cordova, Alaska, a mortgage on certain placer mining claims in the White River Mining District of the Chisana Recording District, Alaska, to secure the payment of four promissory notes totalling $5,150.

The appellants had also become indebted to the Chitina Cash Store, of Chitina, Alaska, for goods furnished and cash advanced in the conduct of their mining operations. The Chitina Cash Store was an indorser of certain of the promissory notes referred to above. The store was owned by O. A. Nelson, one of the appellees herein, and by Johnny Nelson.

Shortly prior to April 11, 1933, an action of foreclosure on the above mortgage was instituted in the District Court for the Territory of Alaska by the bank against the appellants herein.

On March 3, 1933, the attorney for the bank and the store wrote to the appellants in part as follows: "They have authorized me to state that if you will give a conveyance of the property such as a deed so that they may have control of its operation, and may make such arrangements as they desire to realize some part of the money they have coming, they will apply all amounts received upon your indebtedness until it is liquidated, and then return the property to you."

On March 9, 1933, the appellants, in reply, requested that O. A. Nelson, one of the appellees herein, be sent to Chisana, Alaska, where the appellants resided, so that an arrangement could be worked out as suggested in the attorney's letter.

On April 11, 1933, O. A. Nelson went to Chisana and conferred with the appellants. W. E. James testified as follows:

"He [Nelson] said he came as trustee from the First Bank of Cordova. He had a deed for me to sign, made out for one dollar. There was nothing in the deed about Mr. Donohoe's proposition, nothing was said about returning my notes or getting my ground back, or about the way it took my money out, nor the way it would be applied, or that I was to vacate, simply to turn it over to them. Mr. Nelson said I would have to trust the Bank. I wouldn't sign. I said I would rather give you the ground. *I will give you the ground if you will pay my bills and give me a clean slate.* He said he would take the proposition to the Bank and submit it to them with the understanding that if the Bank turned the proposition down he would turn that deed back to me on the first mail, which would be in about thirty days. When my wife told him, 'You might keep that deed,' he said, 'I would hate to think my word wasn't good enough that I wouldn't return that deed to you people.' We signed it the next morning." (Italics our own.)

The conveyance referred to in the foregoing testimony was captioned "Deed and Bill of Sale," and was dated April 11, 1933. It purported to grant and sell to O. A. Nelson, who was designated as "Trustee," the mining claims referred to above, together with a sawmill and cabin situated near the post office at Chisana, and other buildings and appurtenances.

Immediately after the deed was signed, O. A. Nelson returned with it to Chitina. Two days later, on April 13, 1933, he wrote to the appellants as follows:

"The bank's first proposal was that they held the ground in trust till the debts were paid and then return the ground to you, but any unexpired leases that the Bank might give would hold until they expired. I understood that you preferred to give up all claim to the ground for all time with the understanding that you get the lease for a year on a plot of ground selected by yourself 100 by 100 feet, on Bonanza Creek on the [mouth] of Little Eldorado, and also that the Bank of Cordova and the Chitina Cash Store would accept the bill of sale for the ground as full and final satisfaction for the amounts you owe the two institutions.

"I do not want any possibility for a misunderstanding and if this is the way you intended the matter to stand, I wish you would write a note on the bottom of this page to that effect and sign it."

On April 15, 1933, the appellant O. A. Nelson, who was United States commissioner and ex officio recorder for the Chitina precinct, filed the deed for record.

On April 16, 1933, the appellant W. E. James replied to Nelson's letter of April 13 as follows:

"I prefer to [sic] the proposition of your cleaning up all of my indebtedness in First Bank of Cordova and Chitina Cash Store by deed for all time, returning me notes and receipts paid in full.

"I am to have the lease on the said mentioned ground to mine this summer or season, and to keep whatever gold I may recover from same; also the use of cabin on No. 6 Claim while mining same. * * *"

On April 17, 1933, O. A. Nelson gave to N. P. Nelson, another of the appellees herein, a lease of certain mining claims covered by the deed referred to above, for a term to expire on October 1, 1942, the lessee agreeing therein to pay to the lessor, as royalty, 10 per cent. "of the gross amount of gold."

At later dates, O. A. Nelson gave leases to the appellees Hawkins and McMahan, but those leases have either expired or been surrendered.

Regarding the N. P. Nelson lease and the correspondence that immediately preceded it, O. A. Nelson, on cross-examination, testified as follows:

"A. I made the lease out after I received this letter from the James' [of April 16], confirming my opinion of what the agreement was.

"Q. So the letter was written to you on the 16th; you received it and you made out the lease on the 17th, and that all took place in that short time? Do you want the court to understand that?

"A. I do. I didn't make that lease out until after I got the letter back because N. P. Nelson wouldn't accept the lease until he knew the ground was in the clear."

There was testimony that N. P. Nelson took immediate possession under his lease, and thereafter started prospecting. He testified that he was with the appellants "almost every day" while working on those claims; that they did not make any objection to his doing so; that the appellant W. E. James told Nelson that he had turned over to Nelson a cabin, requesting and receiving from Nelson permission to store temporarily the appellants' personal be-

longings there until such belongings could be removed; and that, in order to enter the cabin in which Mrs. James "had her home," the witness pulled "the fastening chain that pulls the lock, and went in."

In this connection, it should be mentioned that in their brief the appellants concede that W. E. James permitted N. P. Nelson "the use of a couple of cabins on the property," but explain this by stating that "It is an unwritten law of Alaska that mining cabins are the common property of all miners who seek shelter there."

The appellant Agnes James testified that N. P. Nelson was not working "on any of the ground in 1933," and added:

"He flew in the early part of May, 1933, and came up the creek and started to work on Seven and Eight. There was no work done on the claims there at all; but there were notices on all the claims that the ground belonged to us, they tore the notices off the house and sawmill. Notices were posted in October, 1933, and some after Mr. James got back from Valdez seeing Mr. Ray. N. P. Nelson had not been using the pipe line or flume during 1933. He was doing dead work to bring the water down, making a ditch to run the flume through to take water off to one of the benches. He started to work July 15, the same day he came up the creek."

Testifying in February, 1935, regarding the work that he had done under the lease from O. A. Nelson, N. P. Nelson said:

"Since prospecting in 1933, I worked the ground the summer of 1934. * * * I have held this property ever since I went there in April and have been mining it ever since. We expended for supplies, merchandise, and so forth, $7,899; freight bill $2,000, the freight bill on this merchandise, $2,897; I paid out for labor $5,660. The total is $16,540. I recovered $9,000 gold. * * *

"I didn't have the necessary money to pay for the merchandise and freight. O. A. Nelson is interested with me."

As to the appellants' knowledge of N. P. Nelson's activities on the property, Henry Boyden, a guide, who said that he had no financial interest in the present case, testified regarding a conversation held in July, 1933: "Mr. and Mrs. James said they had a deal with the Chitina Cash Store and the Bank and they were taking over the ground. Mrs. James said they were very well satisfied with the deal, Mr. James said the same

thing; they said they were leaving the country to go to 40-Mile by way of Dawson, and she. had some gold dust and she said she wished to pay 'some bills, one particularly to Joe Davis. Mr. James said the ground was worthless, it had been worked out, people hanging around there were foolish and starving to death, and the longer they stayed the worse state they would be in. *They said N. P. Nelson wouldn't be paid for his time working the ground, that the ground was worked out.*" (Italics our own.)

The appellant James testified that N. P. Nelson said that he "was just a laborer there, working for O. A. Nelson"; that the witness had no knowledge that N. P. Nelson "was there in any interest, or regard to this deed or lease at that time"; and that the first time that the witness knew that N. P. Nelson had any possession of the ground was in a letter received from O. A. Nelson in October, 1933.

In this latter statement, the appellant James is clearly in error, as may be seen from his own testimony: "I heard nothing from [O. A.] Nelson from April 16 to June 30, 1933. Then I got a letter from him, and ·with it a lease covering the ground that I was to receive as a part of my original proposition to the bank."

The letter referred to by James clearly establishes that at least as early as June 30, 1933, he was informed of N. P. Nelson's claims as lessee from O. A. Nelson: .

"My dear James:

"* * * N. P. Nelson has a lease on part of the ground, and the royalty from his lease and any other leases will go to pay off the mortgages. When these are paid, then the royalties will go to you. Probably you have as good an idea as I have how long that will be. If we find later that we can afford to take up the indebtedness to the bank, then we will have the mortgage satisfied and you will be relieved of all responsibility for the indebtedness."

On September 10, 1933, James wrote to the bank, asking "why this deed had not been sent back to me." A few days later, he received a letter from the bank informing him that his notes had been forwarded to O. A. Nelson, and that James would have to look to the latter for the notes.

Upon writing to O. A. Nelson, the appellant James received from the former a letter dated October 12, 1933, setting forth

Nelson's understanding of the course of dealings between the parties up to that time:

"On the 11th of April you made a deed and bill of sale for the mining claims and personal property. * * *

"On the 20th of April I gave you a lease on a plot of ground at the mouth of Little Eldorado Creek which lease expired at the first of October, 1933.

"The deed and bill of sale was an outright and complete transfer of title, but at the time we considered both the propositions of returning the property to you, if and when the indebtedness had been paid, and of making the transfer permanent. I have a signed statement from you in which you say that you prefer to make the sale permanent on condition that the mortgage be cancelled and the notes returned to you.

"I now hold the mortgage and the notes and they are a valid lien against any property you have until they are satisfied or returned to you and discharged.

"N. P. Nelson has possession of all of this property and you are hereby authorized to turn over to him all of the property named and described in the bill of sale. I am sending him a copy of this letter with instructions to receive this property and to check up thoroughly on the same, which he is in a position to do, as he knows what was on the ground at the time the mortgage was made.

"As soon as I receive word from N. P. that you have turned over all of the property covered by the deed and bill of sale, and have vacated the ground completely, and have met all of the terms of the above named deed and bill of sale, then I will send you the notes named therein and will send you the mortgage with the endorsement that it has been fully satisfied."

On October 18, 1933, the appellants replied, reiterating their original proposition and asserting that they did not consider the deed valid, since their proposition was not accepted.

Shortly thereafter, O. A. Nelson wrote to the appellants, ordering them off the property, and, by N. P. Nelson, he also sent the canceled notes to James. Concerning that tender, the latter testified: "After I got back from Valdez, I was walking by N. P. Nelson's cabin. He said, 'O. A. Nelson has sent you in a package of papers, you better come in and get them.' My wife opened them and I noticed these notes. I didn't take them. I said the deal hadn't been fulfilled and it was all off. I remained on the ground. I had possession of the ground."

On April 27, 1934, the appellants filed a bill in equity in the court below, praying for the cancellation of the deed from them to O. A. Nelson, for the appointment of a receiver for the mining property, for a temporary restraining order, etc. The bill alleged fraud and misrepresentation on the part of O. A. Nelson.

Each of the appellees filed demurrers which were overruled. Thereupon each appellee filed a separate answer denying the allegations of fraud and misrepresentation, and averring that each appellee holding a lease from O. A. Nelson had entered into the possession of the mining claims respectively leased to him, "with the full knowledge and consent" of the appellants.

In his answer, O. A. Nelson also set forth that, although the word "trustee" was used after his name in the deed from the appellants, dated April 11, 1933, "it was intended to be and specifically agreed by and between plaintiffs and defendant that such deed was an outright conveyance, and not in any manner or sense to create a trust.

After a trial on the merits, the court below made findings of fact, conclusions of law, and a supplemental and final decree holding that the appellants' deed to O. A. Nelson, dated April 11, 1933, was null and void; that O. A. Nelson acted as the appellants' trustee in making the lease to N. P. Nelson; that the appellants are estopped from denying the validity of the lease to N. P. Nelson, except as to a certain parcel described therein; that the N. P. Nelson lease, save as to such excepted parcel, remain in force and effect as if it had been executed by the appellants; that all rights accruing to O. A. Nelson under the lease to N. P. Nelson shall accrue to the appellants "the same as though said lease were made by the plaintiffs instead of the said O. A. Nelson"; and that N. P. Nelson, at the close of the mining season during each year of the leasehold period, shall report in writing the gross amount of gold extracted from the leased premises, and shall deliver to the appellants duplicate receipts of all smelter returns, etc.

The decree also declared the appellants to be the owners of the mining claims, subject to the paramount title of the United

States and to the mortgage in favor of the First Bank of Cordova, hereinabove referred to; and adjudicated the appellants as being entitled to immediate possession, subject to the rights of N. P. Nelson under his lease from O. A. Nelson.

From that portion of the supplemental and final decree holding that O. A. Nelson acted as trustee and agent for the appellants in making the lease to N. P. Nelson, and that the appellants are estopped from denying the validity of such lease, the present appeal has been taken.

While asserting that this appeal presents only one question—that of estoppel—the appellants, "for clarity and convenience," subdivide that question as follows:

"1. What record notice, if any; was imparted to N. P. Nelson, the lessee, upon which the doctrine of estoppel can be invoked against the appellants?

"2. What acts or conduct, founded in fraud, misled the said N. P. Nelson to his damage, upon which the doctrine of estoppel can be invoked against appellants?"

The appellants contend that the deed and bill of sale given by them to O. A. Nelson, trustee, contained no acknowledgment, was signed in the presence of only one witness, was therefore not entitled to record, and consequently "gave no constructive notice to N. P. Nelson, a subsequent purchaser of an interest therein."

In support of their argument, the appellants quote the following provisions of the Compiled Laws of Alaska 1933:

"Sec. 2818. *Deeds executed in Territory; two witnesses; acknowledgment.* Deeds executed within the Territory of lands or any interest in lands therein shall be executed in the presence of two witnesses, who shall subscribe their names to the same as such; and the persons executing such deeds may acknowledge the execution thereof before any judge, clerk of the District Court, notary public, or commissioner within the Territory, and the officer taking such acknowledgment shall indorse thereon a certificate of the acknowledgment thereof and the true date of making the same, under his hand."

"Sec. 2833. *Deed proved may be read in evidence; recording.* Every conveyance acknowledged or proved or certified in the manner hereinbefore prescribed by any of the officers before named may be read in evidence without further proof thereof, and shall be entitled to be recorded in the precinct in which the lands lie."

While the Compiled Laws of 1933 did not come into effect until December 21, 1933, subsequently to the date of the appellants' deed to O. A. Nelson, the two foregoing provisions are substantial reenactments of sections 508 and 520 of the Compiled Laws of the Territory of Alaska of 1913.

The appellees concede that the deed, though in fact recorded, was not entitled to record, since it was not acknowledged; and, indeed, in support of that concession, they quote another provision of the Compiled Laws of 1933:

"Sec. 2828. *Proof of execution by witness.* Proof of the execution of any conveyance may be made before any officer authorized to take acknowledgment of deeds, and shall be made by a subscribing witness thereto, who shall state his own place of residence and that he knew the person described in and who executed such conveyance; and such proof shall not be taken unless the officer is personally acquainted with such subscribing witness or has satisfactory evidence that he is the same person who was a subscribing witness to such instrument."

The appellees, however, assert—and, we believe, correctly—that the question of recordation is not important here, since we are not dealing with the problem of constructive notice.

An examination of the record convinces us that N. P. Nelson, the lessee of O. A. Nelson, had *actual* notice of the appellants' deed to O. A. Nelson. According to O. A. Nelson's testimony, "N. P. Nelson wouldn't accept the lease until he knew the ground was in the clear." The court below found that the appellants "told and informed the defendant, N. P. Nelson, that they had made, executed and delivered the deed above mentioned to the defendant O. A. Nelson."

It is well established that, in the absence of statutory requirement, acknowledgments are not essential to the validity of an instrument, as between the immediate parties and their privies. This rule is particularly applicable in cases where, as here, a deed is relied upon as creating an estoppel.

The courts of Alaska have recognized this principle. In Morency v. Floyd, 2

Alaska, 194, 197, 198, the case involved the construction, inter alia, of section 82 of Carter's Civil Code of Alaska of 1900, the text of which section is almost identical with that of section 508 of the 1913 compilation. With such a provision before it, the court there said:

"An instrument in writing, signed by the parties, may serve as one step in the conveyance of real estate, although it is neither witnessed, acknowledged, or recorded. Such an instrument, containing, as that in question does, apt words to convey, when made, signed, and delivered to the grantee, and followed by acts constituting estoppel, becomes sufficient, as between grantor and grantee, to convey the legal title. Witnesses, acknowledgment, and record add nothing to the agreement between the parties; they are formalities required by the law, and become prima facie evidence only of the final conclusion of the contract. If added to this deed, no question would be raised about its sufficiency in law. The instrument of date November 29th is, therefore, a valid contract between the parties; it lacks only the formalities of witnesses, acknowledgment, and record, required by law. Its making and signing by the grantor and its delivery to the grantee are not disputed. It is produced by the grantors' attorney at law and in fact, upon a notice requiring him to produce an instrument signed by Floyd, and conveying, or purporting to convey, a half interest in the land in dispute to Cascaden. It is a simple contract of conveyance between the grantor and grantee, but it lacks the statutory formalities. The consideration is admitted, and every element in support of a quitclaim title in Cascaden is present.

"With this conveyance in his favor, and on February 11, 1903, Cascaden made, signed, and delivered a deed of all his undivided one-half interest in the property in dispute to F. H. Gage. This deed was also lacking in one of the statutory formalities—it was not acknowledged. Among its three witnesses, however, was Floyd, and on the 6th day of March, 1903, he signed an affidavit written on the back of the deed from Cascaden to Gage, stating his own place of residence, that he knew the person described in and who executed such conveyance as grantor, and that the grantor signed the deed in his presence. Upon this proof the deed became entitled to be, and was, recorded on March 11, 1903. Section 89, Civil Code of Alaska. [Now section 2828 of the Compiled Laws of 1933; cf. section 515 of the Compiled Laws of 1913, both supra.] Having in good faith, by his contract of November 29, 1903, sold an undivided one-half interest in the claim to Cascaden; having acknowledged the receipt of the consideration mentioned therein; having on February 11, 1903, been present when Cascaden sold the same property to Gage; having acted as a witness upon the deed to Gage; and having thereafter, and on March 6, 1903, secured its proof and made it valid by his oath in accordance with the law—Floyd is now estopped to deny the title then obtained by Gage. 7 Am. & Eng. Ency. of Law, p. 18, and notes."

So here, the execution and delivery of the deed are undisputed. The instrument is annexed and made part of the appellants' bill in equity, and is set forth by three of the appellees in their respective answers. The execution and delivery of the deed were realleged by the fourth appellee. The record also shows that the deed did have two witnesses, although one of them was not present when the instrument was signed, but affixed his signature later.

As for the consideration, the letter of the appellant James shows that he intended the transfer to be a "deed for all time," in return for O. A. Nelson's "cleaning up all my indebtedness in First Bank of Cordova and Chitina Cash Store, * * * returning me notes and receipts paid in full." When, through N. P. Nelson, O. A. Nelson tendered the notes to James, the latter refused to accept them, declaring that "the deal hadn't been fulfilled and it was all off."

In 1 C.J.S. 780, 781, Acknowledgments § 6, the rule is thus stated: "Since, as has been seen in § 2, acknowledgments are matters purely of statutory requirement, they are not, in the absence of such requirement, essential to the validity of an instrument, nor do they constitute a part of the contract or conveyance between the parties, which, although unacknowledged, becomes effective and binding between them as a transfer of title or otherwise upon its execution and delivery, and a person who signs, seals, and delivers an instrument as his deed cannot be heard to question its validity because it was not acknowledged by him nor proved at the time of delivery. This rule applies not only to the immediate parties to the instrument but as to their

privies, persons claiming under them, and their personal representatives and heirs." See, also, 18 C.J. 246-247; 21 C.J. 1067, § 26; Rocky Cliff Coal Mining Co. v. Kitchen, 29 N.M. 395, 222 P. 658, 659.

In support of their contention that the lack of acknowledgment and the defect in attestation caused the deed to impart "no notice to N. P. Nelson of any right, title, or interest in O. A. Nelson to the mining property of appellants," they cite the cases of Eadie v. Chambers, 172 F. 73, 24 L.R.A. (N.S.) 879, 18 Ann.Cas. 1096, and Alaska Exploration Co. v. Northern Mining & Trading Co., 152 F. 145, both Alaska cases decided by this court. The former was reversed by the Supreme Court, sub. nom. Waskey v. Chambers, 224 U.S. 564, 32 S. Ct. 597, 56 L.Ed. 885, Ann.Cas.1913D, 998, and the latter is at once distinguishable from the case at bar by the following language used therein, 152 F. at pages 145 and 147, by the late Judge Ross:

"It is not pretended that the defendant in error had any actual notice of such prior conveyance, but it was sought by the plaintiff in error to show constructive notice to it by the introduction of a certified copy of the record in the office of the recorder of the mining district in which the claim is situated of a deed. * * *

"As has already been said, there was no offer of any proof to show that the defendant in error had at the time of its purchase any actual notice of any prior conveyance of the property by Thomas."

In the instant case, on the other hand, reliance is not placed upon any constructive notice that N. P. Nelson might have had, regarding the deed from the appellants to O. A. Nelson. There is evidence in the record, and the court below so found, that N. P. Nelson had *actual* notice of the deed.

According to the foregoing authorities, therefore, it is necessary to examine the statutes of Alaska in order to ascertain the effect that lack of acknowledgment has upon the efficacy of a deed as between the parties and their privies, particularly with reference to estoppel.

Section 524 of the Compiled Laws of 1913, which is not referred to in the briefs herein, reads as follows: "Every conveyance of real property within the District hereafter made which shall not be filed for record as provided in this chapter shall be void against any subsequent innocent purchaser in good faith and for a valuable consideration of the same real property, or any portion thereof, whose conveyance shall be first duly recorded."

The above section is a verbatim re-enactment of section 98 of Carter's Civil Code of 1900, and, in turn, has been re-enacted, almost verbatim, as section 2837 of the 1933 compilation, supra.

■ Under the rule of *Expressio unius est exclusio alterius,* it is clear that, under the settled public policy of Alaska, failure of recordation does not affect the validity of a deed as between parties and privies, for purposes of estoppel or otherwise.

■ It would be absurd to argue, of course, that, assuming N. P. Nelson to be a "subsequent innocent purchaser in good faith and for a valuable consideration," such a deed, under the language of section 524, supra, would be void "against" him. The context clearly establishes that the statute was intended to *protect* innocent purchasers against unrecorded deeds to third parties, and not to deprive such purchasers of their title, as against their own grantors' privies, merely because their grantors had failed to record their deed. As to innocent purchasers, section 524 is a shield, not a sword.

■ We conclude, therefore, that, under the statutes and decisions of Alaska, an unrecorded deed is valid as between the parties. In this respect, the Alaska rule accords with general law. Under that rule, the appellants are estopped from denying the validity of their conveyance to O. A. Nelson, or the latter's lease of some of the claims to N. P. Nelson. In other words, the appellants' right to recover is defeated as a result of estoppel by deed.

Not only through estoppel by deed, however, are the appellants barred from prevailing in the instant case. They are also defeated as the result of estoppel in pais, or estoppel by conduct.

The elements of this latter type of estoppel are well stated in Nelson v. Chicago Mill & Lumber Corporation (C.C.A.8) 76 F.(2d) 17, 21, 100 A.L.R. 87: "The essential elements of estoppel, as applicable in this case, are: (1) Ignorance of the party claiming estoppel of the matter asserted; (2) silence concerning matter where there is a duty to speak amounting to misrepresentation or concealment of a ma-

918

terial fact; (3) action by the party relying on the misrepresentation or concealment; and (4) damages resulting if the estoppel is denied. [Many cases cited.]"

In more trenchant language, in Dickerson v. Colgrove, 100 U.S. 578, 580, 25 L. Ed. 618, the Supreme Court thus expounded the doctrine: "The estoppel here relied upon is known as an equitable estoppel, or estoppel in pais. The law upon the subject is well settled. The vital principle is that he who by his language or conduct leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by disappointing the expectations upon which he acted. Such a change of position is sternly forbidden. It involves fraud and falsehood, and the law abhors both. This remedy is always so applied as to promote the ends of justice."

Again, in Gregg v. Von Phul, 1 Wall. (68 U.S.) 274, 281, 17 L.Ed. 536, the court said: "The doctrine of estoppels in pais, or by the act of the party, is founded in natural justice, 'and is a principle of good morals as well as law.' 'The primary ground of the doctrine is, that it would be fraud in a party to assert what his previous conduct had denied, when on the faith of that denial others have acted.' [Cases cited.] No one is permitted to keep silent when he should speak, and thereby mislead another to his injury. If one has a claim against an estate and does not disclose it, but stands by and suffers the estate sold and improved, with knowledge that the title has been mistaken, he will not be allowed afterwards to assert his claim against the purchaser. And justly so, because the effect of his silence has actually misled and worked harm to the purchaser. And in this case the silence of Gregg concludes him." See, also, Pacific Mill & Mining Co. v. Leete (C.C.A.9) 94 F. 968, 975; 21 C.J. 1059-1062; Mascarel v. Mascarel's Ex'rs, 3 Cal.App. 501, 86 P. 617, 618; Mills v. Rossiter Co., 156 Cal. 167, 103 P. 896, 897; Bigelow on Estoppel (6th Ed.) ch. xviii, pp. 602-716; California Packing Corporation v. Sun-Maid R. Growers (C.C.A.9) 81 F.(2d) 674, 679, certiorari denied 298 U. S. 668, 56 S.Ct. 833, 80 L.Ed. 1391.

The excerpts from the record that we have already set forth indicate that the appellants' conduct with reference to the N. P. Nelson lease estops them from now attacking its validity. Nelson testified that he saw them "almost every day while working" on one of the leased claims, and that they made no objection to his doing so. The appellants themselves admit that they lent Nelson "a couple of cabins on the property." There is disinterested testimony that they said Nelson "wouldn't be paid for his time working the ground, that the ground was worked out." There is documentary evidence that, at least as early as about June 30, 1933, the appellants knew that N. P. Nelson was claiming under a lease from O. A. Nelson. Yet not until October 18, 1933, did they assert that their deed to O. A. Nelson was invalid, while in the meantime N. P. Nelson had gone ahead with his prospecting work, and had expended considerable sums of money on the property.

While there was some conflicting testimony with reference to the appellants' knowledge of N. P. Nelson's activities on the claims and their acquiescence therein, the court below found that Nelson took possession "with the full knowledge and consent" of the appellants, and "spent large sums of money" in development work. There was testimony to support this finding; and, since the court below had the opportunity of seeing and hearing the witnesses, we are not disposed to disturb it.

The appellants assert that the defense of estoppel cannot here be entertained, because it was not pleaded. We cannot concur in this statement. Each separate answer filed by the various appellees either sets out or refers to the deed from the appellants to O. A. Nelson; alleges "by way of affirmative defense and counterclaim" that the appellants informed the appellees that they had executed the deed; alleges that each of the appellees entered into the possession of the mining claims with the full knowedge and consent of the appellants; and avers that the respective leases to the various appellees were entered into with the appellants' full knowledge.

The foregoing, we think, is a sufficient pleading of estoppel in pais. "An estoppel arises as a conclusion of law from the facts pleaded, rather than from the mere designation of the act as an estoppel." Carter v. Rinker (C.C.) 174 F. 882, 886; City of Ironton v. Harrison Const. Co. (C.C.A.6) 212 F. 353, 357; 21 C.J. 1245.

As is pointed out in Carter's Annotated Alaska Codes, Introduction, page xvii, section 7 of the Act of May 17, 1884-

(23 Stat. 25), passed by Congress, provided "That the general laws of the State of Oregon now in force are hereby declared to be the law in said district [of Alaska], so far as the same may be applicable," etc. It is therefore helpful to examine the jurisprudence of Oregon on the subject of pleading estoppel. While a state decision is ordinarily not binding upon a federal court in an equity suit, such decision is even there clearly entitled to persuasive effect.

In Carlyle v. Sloan, 44 Or. 357, 75 P. 217, 222, Mr. Justice Bean, of the Supreme Court of Oregon, said: "And, finally, it is said that estoppel is not pleaded. The facts are set out in the complaint, and the failure to allege that by reason thereof the defendants are estopped to assert title to the property in question as against the plaintiff is not fatal after trial. *Equity is not governed by such technical rules.* Where facts which entitle the plaintiff to the relief sought are set out in the complaint and sustained by the testimony, the relief will, after answer and trial, be granted, notwithstanding the complaint may lack some of the requisites of a technical pleading. McCall v. Porter, 42 Or. 49, 70 P. 820, 71 P. 976. The plaintiff in this case in purchasing the property relied upon the map as exhibited by Henry and the general understanding of all the parties, and it would now be inequitable and unjust to allow either Henry, or any one for whom he might act, to profit by the mistake." (Italics our own.) See, also, Putnam v. Chase, 106 Or. 440, 212 P. 365, 367.

 Furthermore the facts establishing estoppel were clearly proved in this case, though the appellants introduced evidence tending to dispute the estoppel testimony of the appellees. For example, after N. P. Nelson had testified that he had spent considerable money in the development of his lease—a fact that had bearing only on the question of estoppel—the appellants, on cross-examination, developed from him the testimony that he "didn't have the necessary money to pay for the merchandise and freight," and that O. A. Nelson was "interested" with him. The only purpose of eliciting this bit of evidence was to weaken the effect of N. P. Nelson's testimony in chief as to his expenditures.

Again, the appellant James testified that he did not see N. P. Nelson "right on the ground" during the summer of 1933; that

Nelson had said that he "was just a laborer there, working for O. A. Nelson"; that the witness had at that time no notice that N. P. Nelson was there in any connection with the "deed or lease"; and that the first time the witness knew that N. P. Nelson had any possession of the ground was when the former received the letter of October 12, from O. A. Nelson, supra.

Here, again, the sole purpose of the appellant's testimony was to anticipate the defense of estoppel, which was clearly indicated, as we have seen, in the appellees' separate answers.

Moreover, the deed to O. A. Nelson, upon which the appellees chiefly rely for their defense of estoppel, was set forth as part of the appellants' complaint.

The foregoing facts cure any technical defects that might be found in the pleading of estoppel.

 In the first place, under the law of Alaska, insufficient pleading may be cured by the proof. Section 3451 of the Compiled Laws of Alaska of 1933, which were in force when the instant suit was filed, reads as follows: "No variance between the allegation in a pleading and the proof shall be deemed material, unless it shall have actually misled the adverse party to his prejudice in maintaining his action or defense upon the merits. Whenever it shall be alleged that a party has been so misled, that fact shall be proved to the satisfaction of the court, and in what respect he has been misled; and thereupon the court may order the pleading to be amended upon such terms as shall be just."

In the present case, it is plain that the appellants were not misled by the appellees' failure to plead estoppel with technical artificiality; for, long before the appellees had commenced to put in their case, the appellants, as we have seen, were laying the foundation for the counterdefense of "estoppel against estoppel."

Section 3452 of the 1933 compilation provides: "When the variance is not material, as provided in the last section, the court may direct the fact to be found according to the evidence, or may order an immediate amendment, without costs."

In the instant case, after having heard all the evidence, the court concluded as a matter of law that the appellants "are estopped from denying the validity of said lease," except as to a certain portion there-

of that had not been included in N. P. Nelson's counterclaim.

Construing two earlier sections identical with the foregoing provisions of the 1933 laws, in Black v. Teeter, 1 Alaska, 561, 565, the court said:

"No objection having been made to the testimony, but both parties joining in offering it, the court was fairly justified in concluding that neither was misled to his prejudice, and only followed the statute in directing 'the fact to be found according to the evidence' by the jury. Section 97 of the same chapter [identical with section 3461 of the Compiled Laws of 1933] also provides that:

" 'The court shall, in every stage of an action, disregard any error or defect in the pleadings or proceedings which shall not affect the substantial rights of the adverse party.'

"All the substantial rights of the parties were submitted to the jury without objection. The error complained of is only technical. I am satisfied that the verdict rendered is in accord with both the law and the facts, is just and right, and would be the result of another trial. No substantial right of the defendants is taken away or affected unjustly by the verdict, and the error or defect ought, therefore, to be disregarded by the court."

So here, there was no objection to any of the evidence dealing with estoppel, introduced by the appellees. Instead, the appellants seem to have heartily accepted the issue, and to have introduced what evidence they could to combat that defense.

The observations of the court in Black v. Teeter, supra, accords with the doctrine generally prevailing in the Federal courts.

In Standard Sanitary Mfg. Co. v. Arrott (C.C.A.3) 135 F. 750, 756, the court used the following language: "We hold, however, that where, in a suit in equity as in this case, testimony as to facts, upon which an estoppel is contended for, is introduced, not only without objection but contentious testimony disputing such facts is produced on the other side, the contention for an estoppel may be made at the hearing without having been pleaded." See, also, Grand Valley Water Users' Ass'n v. Zumbrunn (C.C.A.8) 272 F. 943, 947; 21 C.J. 1246.

In support of their contention in this connection, the appellants quote from New York Life Ins. Co. v. Rees (C.C.A. 8) 19 F.(2d) 781. Apparently they have overlooked the fact that, on rehearing, the court reversed its previous mandate, and said, at page 788 of the opinion: "The record, however, discloses the facts which we have recited, and shows that each of the parties to this action introduced evidence and participated in the trial of this issue of estoppel of the plaintiff without objection that it was not pleaded. * * * For the reasons which have now been stated, we have concluded that the issue of the estoppel of the plaintiff by her assignment and delivery of the policy to the bank could not lawfully be disregarded in this action by the court below, or by this court, because it was not pleaded."

On the effect of proof as curing defects in the pleadings in an equity case, when no objection is made to the introduction of evidence, the Supreme Court, in Wasatch Mining Co. v. Crescent Mining Co., 148 U.S. 293, 299, 300, 13 S.Ct. 600, 602, 37 L.Ed. 454, used the following language:

"In the district court the defendant did not demur to the complaint as asking a form of relief inconsistent with the terms of the contract alleged, but by an answer and cross bill brought all the facts before the court; *nor did the defendant object to plaintiff's evidence as exhibiting a different case from that asserted in the bill.*

"The supreme court of the territory rightfully held that the defendant should have raised the question in the trial court, where ample power exists to correct and amend the pleadings, and not having done so, but having gone to trial on the merits, the defendant was precluded from assigning error for matters so waived.

"The doctrine on this subject is well expressed in the case of Tyng v. Commercial Warehouse Co., 58 N.Y. [308] 313: 'No question appears to have been made during the trial in respect to the production of evidence founded on any notion of variance or insufficiency of allegation on the part of plaintiff. Had any such objection been made, it might have been obviated by amendment in some form or upon some terms under the ample powers of amendment conferred by the Code of Procedure. It would therefore be highly unjust, as well as unsupported by authority, to shut out from consideration the case, as proved, by reason of defects in the statements of the complainant. Indeed, it is difficult to con-

ceive of a case in which, after a trial and decision of the controversy, as appearing on the proofs, when no question has been made during the trial in respect to their relevancy under the pleadings, it would be the duty of a court, or within its rightful authority, to deprive the party of his recovery on the ground of incompleteness or imperfection of the pleadings.'" (Italics our own.)

Similarly, in the instant case the appellants not only did not object to the introduction of testimony dealing squarely with the defense of estoppel, but they themselves introduced evidence dealing with such defense even *before* evidence on that issue had been offered by the appellees. "Had any such objection been made it might have been obviated by amendment in some form or upon some terms. * * *"

Accordingly the appellants cannot now, on appeal, be heard to object that the issue of estoppel, in which they themselves joined in the presentation of evidence, was not properly tendered by the pleadings.

Finally, even if it is assumed that the appellee O. A. Nelson dealt unfairly with the appellants—which we do not concede—yet the latter are barred by still another equitable principle. By making an outright deed of the claims to O. A. Nelson, the appellants clothed him with a color of title, by virtue of which he ostensibly could give a lease to N. P. Nelson.

It is well settled that, "As between two innocent persons one of whom must suffer the consequence of a breach of trust the one who made it possible by his act of confidence must bear the loss." Eliason v. Wilborn, 281 U.S. 457, 462, 50 S.Ct. 382, 383, 74 L.Ed. 962; Title Guarantee & Trust Co. v. McIlwain (C.C.A. 9) 73 F. (2d) 754, 756; City of Wheeling v. John F. Casey Co. (C.C.A. 4) 74 F.(2d) 794, 796, certiorari denied 296 U.S. 593, 56 S.Ct. 106, 80 L.Ed. 420; Counselman v. Pitzer, 65 App.D.C. 71, 79 F.(2d) 707, 710, certiorari denied 296 U.S. 650, 651, 56 S.Ct. 310, 80 L.Ed. 463; Farmers Nat. Bank & Trust Co. v. Flexible Truck Corporation (C.C.A. 3) 81 F.(2d) 541, 542.

All in all, the equities in connection with the lease to H. P. Nelson are in his favor and against the appellants. Accordingly, the supplemental and final decree is affirmed.