Robert R. SMALLEY et al., Appellants,

v.

JUNEAU CLINIC BUILDING CORPO-
RATION, Appellee.

JUNEAU CLINIC BUILDING CORPO-
RATION, Cross-Appellant,

v.

Robert R. SMALLEY et al.,
Cross-Appellees.

Nos. 1310, 1311.

Supreme Court of Alaska.

Feb. 14, 1972.

R. J. Annis, Juneau, for appellants Hansen and Smalley.

Michael M. Holmes, Faulkner, Banfield, Boochever & Doogan, Juneau, for Juneau Clinic Bldg. Corp..

Allan A. Engstrom, Davidson, Engstrom & Evans, Juneau, for Nola Gibson.

Before BONEY, C. J., and RABINOWITZ and ERWIN, JJ.

OPINION

RABINOWITZ, Justice.

These appeals arise out of a fairly complex factual setting involving the leasing by a closely held corporation of a building to a medical partnership which at the inception of the lease was composed of the majority of the shareholders of the lessor corporation.

In 1957 the Juneau Clinic Building Corporation built a single story concrete medical building, containing approximately 7,100 square feet of useable space, in downtown Juneau. The corporation conducted no business other than that related to the ownership and rental of this building. On August 1, 1960, the corporation and the Juneau Clinic, a medical partnership composed of Doctors C. C. Carter, William M. Whitehead, and Jack W. Gibson, entered into a 10-year lease agreement.

The lease was in writing and was signed by the parties.[1] However, it was not acknowledged. Rent, in the amount of $3,800 was to be paid monthly. In November 1967, the corporation sued Doctors Robert R. Smalley, Peter O. Hansen, and the estate of Doctor Gibson for nonpayment of rent under the lease. The pertinent facts which preceded the corporation's initiation of this litigation are as follows.

The doctors and staff of the Juneau Clinic partnership occupied the building under the lease from August of 1960 until June 30, 1967. During that period the number of doctors in the partnership fluctuated. At the time Smalley was recruited to the partnership in May of 1960, there were five other physicians who were members[2] of the partnership. When Hansen arrived in 1964, there were six other physicians. However, during a period of

---

1. Carter, president, and Gibson, secretary, signed on behalf of the corporation. Carter, Gibson and Whitehead, co-partners doing business under the name "Juneau Clinic," signed as lessees. The stock of the corporation was closely held, with Gibson, Whitehead, and Carter holding a majority interest.

2. Doctors could be full ("senior") partners, junior partners or associates. Smalley and Hansen eventually became full partners. Gibson, whose administratrix was a defendant below, was a full partner.

about six months in 1965 and 1966, four doctors left the clinic or gave notice of intent to leave. A fifth, Gibson, was expelled from the partnership for a short period in October of 1965.[3]

Despite intensive recruitment efforts, there were only three physicians practicing at the clinic by the beginning of 1967. As the number of physicians diminished, the remaining doctors were forced to work long hours to compensate for high overhead costs. On June 30, 1967, Gibson withdrew from the partnership. Smalley and Hansen then assessed the partnership's financial situation, found it to be disastrous,[4] and immediately ceased practicing at the clinic building. One part-time and two full-time employees were kept on the premises for the purpose of collecting receivables and transmitting patients' records. These employees occupied two small offices in the clinic, remaining there until March 15, 1968.

Thereafter the corporation sued Smalley, Hansen, and the estate of Gibson[5] for rent due until the expiration of the lease on July 31, 1970. The superior court granted Smalley, Hansen, and Gibson's motion for partial summary judgment, holding the lease void because it lacked acknowledgment. The corporation then amended its complaint, alleging it was due rent for January and March of 1967 and for the period July 1967 through April 1968. The trial court subsequently granted motion for summary judgment, holding that the assets of the Juneau Clinic partnership were first liable for payment of any judgment obtained by plaintiff for rent, and that Smalley and Hansen, doing business as the Juneau Clinic, were solely liable for any rental payments found due to the plaintiff.[6] After all parties had rested, the court directed a verdict in favor of the corporation for $37,500.[7]

---

3. Apparently in an effort to keep the partnership functioning, an agreement in October 1965, between Gibson, Smalley, Dr. Henry I. Akiyama (a partnership member at that time), and Hansen was signed after Gibson's expulsion. In return for Gibson's readmittance to the partnership, he and Smalley agreed that in the event that either Akiyama or Hansen
 should be among the partners remaining at the time a final dissolution and winding up of the partnership occurs, then, in any such event, Dr. and Mrs. Gibson and Dr. and Mrs. Smalley do hereby agree, as of the date of such event, to hold Dr. Akiyama and Dr. Hansen harmless from all liabilities, claims and demands of any nature and description existing against said partnership on the date of such event, including but not limited to any further obligation under that certain lease dated August 1, 1960 . . . .
 At the same time, in a separate agreement, and in return for Smalley's "successful effort to have Gibson reinstated to the partnership," Gibson agreed to hold Smalley harmless from any continuing obligation under the lease for the building if Smalley was a partner at the time of dissolution of the partnership.

4. Projected gross income with two members was $17,920 monthly, while projected gross expenses totalled $19,200 monthly.

5. Gibson signed the lease as a lessee. Smalley and Hansen obligated themselves to perform as lessees under the lease by signing the partnership agreement which provided both that the partnership was bound by the lease and that new members woud be bound by the terms of the partnership agreement. In addition, the lease itself provided that it would
 enure to the benefit of and be binding upon each of the partners above named and *any other person admitted to the partnership* . . . . (emphasis added)

6. This partial summary judgment had the effect of holding the "indemnification" agreements between Gibson, Smalley, and Hansen, *see* note 3 *supra*, to be meaningless insofar as this case is concerned.

7. That amount represented the reasonable rental value of the premises for the 10-month period, July 1, 1967, through April 30, 1968, less $500, the agreed rental value of some equipment the plaintiff had sold. The defendants were found liable for ten months' rent because their employees had occupied for nine months after Gibson left, and the court found a one month notice period was required to terminate the tenancy.

Smalley and Hansen appeal from the court's determination that $3,800 was a reasonable monthly rental and its refusal to apply the "indemnification" agreements against Gibson's estate. The corporation appeals from the court's determination that the lease is void and unenforceable. Gibson's estate urges affirmance of the lower court's decisions in every respect.

We first turn to the issue of whether the trial court's invalidation of the 1960 lease was erroneous. Resolution of this question necessarily controls the disposition of other issues raised in these appeals.

The superior court found the lease to be invalid because it was not acknowledged. The trial court's decision was based on an interpretation of AS 34.15.150(a) which provides in part:

> A conveyance executed in the state of land or an interest in land in the state shall be acknowledged before a judge, clerk of the superior court, notary public, postmaster, or commissioner in the state or proved in accordance with §§ 210 or 220 of this chapter.

■ This statute applies to a lease for a term of years. In the case at bar the corporation does not challenge such application. Moreover, we find the statutory definition of "conveyance" is sufficiently broad to include a lease. In this regard, AS 34.15.350 provides in part:

> "[C]onveyance" includes every instrument in writing by which an estate or interest in real property, including royalty and other interests in minerals, is created, alienated, mortgaged or encumbered, or by which the title to real property is affected, except a will.

Also of significance is the fact that the United States Supreme Court, speaking through Justice Holmes, has held that a lease was a conveyance under an earlier but similar Alaska recording statute. Waskey v. Chambers, 224 U.S. 564, 32 S. Ct. 597, 56 L.Ed. 885 (1912).

The more difficult question here is the effect of the parties' failure to comply with the statutory requirement that the lease be acknowledged. The trial court concluded that such failure rendered the instrument invalid. The court noted that acknowledgment, which had previously been permissive, was made mandatory in 1953, replacing a requirement that deeds and conveyances be signed by two witnesses. The trial court also stated that:

> As a matter of policy, my interpretation is that this was intended to surround the making of an instrument of this kind with formality that would impress upon the parties . . . the seriousness of dealing in land in this manner, and that it was the legislature's intention that no instrument thus failing should be valid, even if between parties, much less as to third parties, without the existence of that formality.

We agree that this question must ultimately be decided as a matter of policy. However, we are unable to agree with the trial court's interpretation of the effect of lack of an acknowledgment as between the parties to the lease in the circumstances of this case. Before discussing the policy issues involved, we think it appropriate to consider prior Alaska case law and the legislative history of AS 34.15.150(a).

While there are no post-statehood cases construing AS 34.15.150(a), a number of Alaska territorial decisions were concerned with the various predecessor statutes which required that a deed or conveyance be executed before two signing witnesses.[8] The corporation cites these cases for the proposition that failure to comply with the acknowledgment requirement does not make an instrument invalid as between the par-

---

8. As noted above, acknowledgment was made mandatory in 1953, at which time the two witness requirement was dropped. Before 1953, then, the two witness requirement occupied the same position that acknowledgement occupies today. The pre-1953 statutes requiring two witnesses are contained in Civil Code of Alaska ch. 11, § 82 (Carter's Codes 1900) ; § 508 CLA (1913) ; § 2818 CLA (1933) ; § 22–3–9 ACLA (1949).

ties to it, but rather only precludes its recordation and thus its effectiveness as against third persons. Cross-appellee Gibson artfully seeks to distinguish them on various grounds.

In Morency v. Floyd, 2 Alaska 194, 197 (1904), the territorial district court held that an unwitnessed, unacknowledged, and unrecorded deed could yet be sufficient, as between grantor and grantee, to convey legal title. *Morency,* however, contained strong elements of estoppel, and the court specifically referred to estoppel in announcing its holding. In Eadie v. Chambers, 172 F. 73, 77 (9th Cir. 1909), the court held that a deed which had been witnessed by only one person was nonetheless valid as between the parties to the deed. However, on appeal to the Supreme Court of the United States, the case was reversed on separate grounds, which made it unnecessary for the court to decide the validity of the deed.[9] In James v. Nelson, 9 Alaska 117, 130, 90 F.2d 910, 915 (9th Cir. 1937), the court found that

> acknowledgments are not essential to the validity of an instrument, as between the immediate parties and their privies. This rule is particularly applicable in cases where, as here, a deed is relied upon as creating an estoppel.

However, as Gibson points out, the acknowledgment requirement which *James* construed was the pre-1953 *permissive* requirement. The case did not concern the mandatory two witness requirement, which we have found is analogous to the post-1953 mandatory acknowledgment requirement. In addition, *James* relied on estoppel, as the quotation above indicates.

Two cases seem to uphold Smalley, Hansen, and Gibson's position, but these two must be qualified. In Rolando v. Zesch, 7 Alaska 437 (1926), the territorial court found a lease to be void as between the original parties where certain formalities were not observed, among them the two witness requirement. However, there were so many irregularities in the execution of the lease that it is inaccurate to say the case concerned only the two witness requirement.[10] The second case is Whitehead v. Foxhill, 13 Alaska 726, 105 F.Supp. 966, 967 (1952), which involved an unwitnessed, unrecorded deed which was subsequently lost. The court stated that the document was "ineffective as a conveyance" but "valid as a contract to convey." However, the court went on to hold that the first grantee had an equitable right to demand conveyance from a subsequent grantee who had purchased the land from the common grantor. Significantly, the first grantee was not limited to money damages but was able to demand specific performance of the contract to convey. Thus, the case is not authority for the proposition that an unacknowledged lease is without legal effect.[11]

Thus, review of the applicable case law in Alaska demonstrates that the cases are split. There is no consistent line of decisions clearly enunciating a decisive statement of the law as to the legal effect of failure to comply with the acknowledgment statute or its predecessors, the statutes requiring two witnesses.

We turn next to the legislative history of AS 34.15.150(a). As noted above, prior to 1953 Alaska law required attestation by two witnesses and permitted ac-

9. Waskey v. Chambers, 224 U.S. 564, 32 S.Ct. 597, 56 L.Ed. 885 (1912).

10. The lease was not under seal; there were no subscribing witnesses; the certificate of acknowledgment did not indicate that the subscribing partners were known to the officer to be the persons who executed the lease; and one of the lessors and one of the lessees subscribed by attorneys and the authorization for such did not appear on the document.

11. Although the case does indicate that a distinction can be made between deeds which comply with statutory form requirements and those which do not, (i. e., the former conveys the land, while the latter gives rise in the grantee to an equitable right to demand conveyance) this distinction is of no importance to the case at bar.

knowledgment.[12] The 1953 amendment deleted the two witness requirement and substituted a provision making acknowledgment mandatory.[13] The trial court found in this legislative action an intent to surround the making of such instruments with formalities so as to impress upon the parties the seriousness of dealing in land. The main implication of the trial court's finding, namely, that unacknowledged leases will be void between the parties, has no discernible logical basis upon which we can choose between attestation and acknowledgment as means of impressing seriousness upon the parties. The clearest link which could be found between the legislative change and the judicial result obtained below would be evidence that prior to 1953 courts treated non-compliance with the mandatory two witness requirement as fatal to a lease's validity. If this were so, we could more readily conclude that the legislature had intended the same consequences to accompany the new mandatory requirement of acknowledgment. But, as our review of the cases indicated, we do not find that pre-1953 decisions follow such a trend. Rather, the cases evidence a split, with the majority upholding the validity of the agreements despite noncompliance with the two witness requirement.

Another possible legislative intent which might be assigned to the statute is that the legislature intended that no instrument that was unacknowledged could be recorded, although if signed by the parties it would be valid as between them. Taking this approach, the 1953 amendment requiring acknowledgment could be viewed as reflective of the legislature's judgment that acknowledgment would be a more effective way than attestation to eliminate clouds on titles and disputes concerning legitimacy. This interpretation is consistent with various policy considerations we consider persuasive. For we think it is a reasonable premise that the parties to agreements such as the lease in this case consider themselves bound by such agreements. Certainly where the parties carry out the various terms of the agreement (occupy, pay rent, etc.) over a period of many years, as occurred in the instant case, the inference that they considered the agreement binding is entitled to considerable weight. Limiting the effect of non-acknowledgment to the parties' relations with third persons would preserve the inference that the parties consider themselves bound, while at the same time requiring compliance with the acknowledgment provisions for those who wish to protect their interest in the unacknowledged instrument against strangers to the agreement.

■ These policy considerations comport with the general rule that the purpose of acknowledgment is usually to allow an instrument to be recorded or to be introduced into evidence without further proof of execution.[14] Both these purposes can be ascribed to the Alaska acknowledgment rule, since an unacknowledged conveyance cannot be recorded and may not be read in evidence without further proof of the conveyance.[15]

■ We therefore conclude that failure to comply with the mandatory acknowledgment requirement of AS 34.15.150(a), while affecting recordation and admissibility, does not have the effect of making the conveyance void as between the parties. The trial court's contrary determination in the case at bar was erroneous.

One additional facet concerning the purported invalidity of the lease in question remains to be discussed. The trial court specifically declined to consider whether the lease was invalid under the statute of frauds in view of its decision that the lease

---

12. § 22–3–9 ACLA (1949).

13. SLA 1953, ch. 29, § 1, codified in § 22–3–9 ACLA Cum.Supp. (1958).

14. E. g., Lillard v. Walsh, 172 Cal.App.2d 674, 342 P.2d 82, 85 (1959); Houck v.

Darling, 238 Or. 484, 395 P.2d 445, 446 (1964).

15. AS 34.15.260.

was void because of noncompliance with the acknowledgment statute. Since we have held that the lease was not void as between the parties to it by reason of non-compliance with the acknowledgment statute, it is necessary to consider whether the lease is rendered void by operation of Alaska's statute of frauds.

The lease agreement was entered into in August 1960. At that time the applicable law provided in part:

1. Except as otherwise provided in this section, an agreement, promise or undertaking shall not be enforceable by action unless it or some note or memorandum thereof be in writing and subscribed by the party to be charged, or by his lawful agent, if such agreement, promise or undertaking is one of the following:

. . . . . .

(f) An agreement for leasing for a longer period than one year . . . .

. . . . . .

3. A contract or promise which is subject to subdivision 1 of this section which does not satisfy the requirements of that subdivision, but which is otherwise valid, is enforceable if . . . .

. . . . . .

(d) The party against whom enforcement is sought admits, voluntarily or involuntarily, in his pleadings or at any other stage of this or any other action or proceeding, the making of an agreement

. . . .

. . . . . .

4. It shall not be permissible to raise the defense of Statute of Frauds unless the party raising the same denies the existence of an agreement, or a material part thereof, in his verified answer or reply, provided, that if the original party to an agreement be deceased, this requirement shall not apply as against his personal representative.[16]

The lease in the instant case satisfies the requirements set out in Section 1, for it is written and it is signed by the parties to be charged (here, their predecessors in interest).

Smalley, Hansen, and Gibson, however, raise the argument that the lease did not satisfy the requirements of section 58–2–4 A.C.L.A.1949 which provided:

No estate or interest in real property, other than a lease for a term not exceeding one year, nor any trust or power concerning such property, can be created, transferred, or declared otherwise than by operation of law, or by a conveyance or other instrument in writing subscribed by the party creating, transferring, or declaring the same, or by his lawful agent under written authority, and executed with such formalities as are required by law.

On the basis of this statute, they argue that the lease was not "executed with such formalities as are required by law"—i. e., it was not acknowledged and thus no interest in property was created.

Resolution of the latter contention depends on whether the exceptions of section 58–2–2 are found to apply to section 58–2–4. If they do not, and section ·58–2–4 is read standing alone, then we would have to hold the lease void because of its lack of acknowledgment. We decline to reach this result because prior decisions which considered section 58–2–4 and its predecessors treated that statute as part of the statute of frauds, and therefore subject to its exceptions. Geist v. O'Connor, 13 Alaska 15, 92 F.Supp. 451, 456 (1950); Weiss v. Girtz, 6 Alaska 547 (1922); Treat v. Ellis, 6 Alaska 290, 305–313 (1920).

■■ We conclude that in determining this statute of frauds question sections 58–2–2 and 58–2–4 must be read together. Thus, section 58–2–2 furnishes exceptions to the operation of section 58–2–4. Study of the record shows that Smalley, Hansen, and the estate of Gibson have admitted the making of the lease in question. In these circumstances, we hold that the lease is not

16. § 58–2–2 ACLA (Cum.Supp.1958).

violative of the statute of frauds. This conclusion makes it unnecessary to decide the further issue as to whether the corporation lessor sufficiently performed under the lease to take the lease out of the ambit of the statute of frauds.

As alternatives to their arguments that the lease was void for lack of acknowledgment and for noncompliance with the statute of frauds, Smalley and Hansen have also advanced the doctrines of impossibility of performance and frustration of purpose to excuse their noncompliance with the terms of the 1960 lease agreement. Since we have held that the lease is not rendered invalid for lack of acknowledgment or noncompliance with the statutes of frauds, we must now consider whether Smalley and Hansen should be excused from their lease obligations by application of either of these doctrines of impossibility or frustration.

Although impossibility and frustration are separate defenses, here they can be dealt with together because we hold both inapplicable to the lease agreement for similar reasons. At the times Smalley and Hansen joined the Juneau Clinic partnership, they were aware that each partner had the right under the partnership agreement to withdraw from the partnership, and thus the contingency of withdrawals by partners was foreseen and not unanticipated. Additionally, the lease specifically provided that individual partners would continue to be liable under the lease should dissolution, by partner withdrawal, occur. Under such circumstances, neither the doctrine of impossibility of performance nor the doctrine of frustration of purpose is available to Smalley and Hansen.[17]

Our holdings in regard to the issues of lease validity and the inapplicability of the asserted defenses of impossibility of performance and frustration of purpose require that the trial court's directed verdict be set aside and the case remanded for a new trial. On retrial, one of the likely issues for jury resolution will be the proper amount of damages to be awarded under the lease. This issue in turn involves determination of the question of whether the corporate lessor undertook reasonable measures to mitigate Smalley and Hansen's damages under the lease.[18] This is not to be taken as an intimation on our part that the sole issues on retrial will be those pertaining to damages.[19]

One final issue remains to be decided in these appeals. Smalley and Hansen appeal from the superior court's partial judgment rendered in favor of the estate of Gibson regarding the effect of the so-called "in-

17. *See* Merl F. Thomas Sons, Inc. v. State, 396 P.2d 76, 79 (Alaska 1964) (impossibility), *citing* 6 Williston, Contracts § 1963, at 5511 (rev. ed. 1938), for the proposition that an unanticipated circumstance, the risk of which should not be thrown upon the promisor, may make performance so difficult from that expected as to excuse the promisor from his duty to perform; Jones v. Fuller-Garvey Corp., 386 P.2d 838 (Alaska 1963) (frustration); United States v. Buffalo Coal Mining Co., 345 F.2d 517, 518 (9th Cir. 1965) (frustration); Megan v. Updike Grain Corp., 94 F.2d 551, 553–554 (8th Cir. 1938).

18. Coffin v. Fowler, 483 P.2d 693, 696 (Alaska 1971); *compare* Jones v. Fuller-Garvey Corp., 386 P.2d 838 (Alaska 1963), where we applied the contract law doctrine of frustration of purpose in deciding a landlord-tenant problem.

19. Under the pleadings, it is conceivable that Smalley and Hansen will be able to marshall a sufficient evidentiary and legal basis to persuade the trial court that there is a jury issue regarding estoppel of the corporate lessor from claiming rentals under the lease. Smalley and Hansen attempted to raise the estoppel issue in a somewhat nebulous fashion relying chiefly on the fact that the major stockholders of the closely held lessor corporation were prominent members of the lessee partnership. Additionally, Smalley and Hansen point to the fact that the withdrawals of Whitehead and Gibson caused the decline of the partnership's medical practice, and that since Gibson, the major stockholder in the corporation, persuaded them to remain the last in the unprofitable medical partnership, it would be inequitable to allow the corporate lessor to hold them to the terms of the lease.

demnification" agreements entered into by Gibson with Smalley and Hansen. In granting Gibson's motion for partial summary judgment, the trial court stated in part

> that as between defendants Gibson, Smalley and Hansen, the assets of the Juneau Clinic partnership are first liable for payment of any judgment obtained by plaintiff for rental of the subject clinic premises; . . . that defendants Smalley and Hansen, d/b/a Juneau Clinic are solely liable to plaintiff for rental of the subject premises after June of 1967 . . . .[20]

Determination of this issue revolves around two agreements which involved Smalley and Hansen. On October 18, 1965, by unanimous vote of the other partners and pursuant to procedures provided for in the partnership agreement, Gibson was expelled from the partnership. Four days later he was readmitted to the partnership. In consideration of his readmission, Gibson entered into two separate agreements. In the first, Gibson and Smalley, along with their wives, agreed

> that in the event that Dr. Akiyama or Dr. Hansen do hereafter withdraw from the partnership, or are expelled, or die, or become disabled from continuing in the partnership, or in the event that either of them should be among the partners remaining at the time a final dissolution and winding up of the partnership occurs, then, in any such event, Dr. and Mrs. Gibson and Dr. and Mrs. Smalley do hereby agree, as of the date of such event, to hold Dr. Akiyama and Dr. Hansen harmless from all liabilities, claims and demands of any nature and description existing against said partnership on the date of such event, including but not limited to any further obligation under that certain lease dated August 1,

1960, between Juneau Clinic Building Corp., as lessor, and C. C. Carter, William M. Whitehead and J. W. Gibson, all co-partners, as lessees, and any obligations due withdrawing partners of this partnership, its predecessor partnership or succeeding partnerships.

In the second agreement, Gibson promised:

> In the event that Dr. Smalley should be among the partners remaining at the time a final dissolution and winding up of the partnership occurs, then, in such event, Dr. Smalley shall be relieved of any further obligation under [the lease]
> . . . .

Gibson's estate now contends that because Gibson left the partnership on June 20, 1967, he cannot be held liable for any partnership debts accrued after that date.

■ This argument has some merit under the trial court's determination that the lease was void (and hence Smalley and Hansen were not liable under the lease, but only were liable for the reasonable rental of the premises as holdover tenants), but it is unpersuasive in light of our determination that the lease was valid as between the parties. The lease obligation pre-existed Gibson's departure from the partnership, since such obligations arise as of the time a valid lease is entered into.[21] In agreeing to hold his partners harmless from any lease obligation liabilities existing against the partnership, Gibson bound himself in a way that he cannot escape under the facts of this case. For in construing these agreements, we must attempt to give effect to the intent of the parties.[22] We think that the intent of the two agreements gauged by the agreements themselves, was to establish that, in the event they remained partners until dissolution, Smalley and Hansen were to be held harmless against any claims for rent arising

---

20. As previously indicated, this partial summary judgment had the effect of holding the "indemnification" agreements between Gibson, Smalley, and Hansen, see notes 3 and 6 supra, meaningless insofar as this case is concerned.

21. Richman v. Joray Corp., 183 F.2d 667, 670–671 (4th Cir. 1950).

22. Port Valdez Co. v. City of Valdez, 437 P.2d 768, 771 (Alaska 1968).

from the lease.[23] Admittedly the agreements did not specifically envision the possibility that Gibson might not remain a partner. Yet his withdrawal did not in any way lesson or relieve him of his duty to hold Smalley and Hansen harmless. The plain language of the agreements indicates that Gibson agreed to hold Smalley and Hansen harmless "as of the date of [dissolution]" whether or not he was a partner at that time.

Our holding as to the effect of the "indemnification" agreements requires that we decide a second facet of the trial court's construction of these agreements. This point concerns whether the trial court correctly decided that the assets of the Juneau Clinic partnership are first liable for payment of any judgment obtained by the corporate lessor for rental of the clinic premises.

 Gibson argues that at most the agreements were "limited to the personal liability of Hansen and Smalley and did not go to the assets of the Juneau Clinic partnership." But the language of the agreements may also be construed so as to lead one to the conclusion that they were meant to protect the partnership interests of Smalley and Hansen, as well as those individuals personally. Given these circumstances we have previously held that where uncertainty or ambiguity exists in the language employed in an agreement, the intent of the parties thereto "may be ascertained from the language and conduct of the parties, the objects sought to be accomplished and the surrounding circumstances at the time the contract was negotiated." Pepsi Cola Bottling Co. v. New Hampshire Ins. Co., 407 P.2d 1009, 1013 (Alaska 1965). Since we find the two agreements ambiguous as to whether it was the intent of the parties to provide that the assets of the Juneau Clinic partnership were to be made first liable for the payment of a judgment for rent, we hold that under the criteria of *Pepsi Cola* this issue was an inappropriate one for resolution by summary judgment. At the new trial evidence will have to be adduced to properly resolve this issue.

Reversed and remanded for a new trial.

CONNOR, J., not participating.

ERWIN, Justice (concurring).

I specifically concur in the disposition of the issues raised in the majority opinion, but would go further and remove an existing ambiguity in Alaska's "parol evidence rule".

The majority opinion returns to the "objective theory" of interpretation of contracts followed by the Restatement of Contracts [1] and Professor Williston [2] and which had been specifically adopted in Alaska [3] prior to the case of Alaska Placer Co. v. Lee, 455 P.2d 218 (Alaska 1969). This approach requires the court to view the wording of a contract objectively to as-

23. In Pepsi Cola Bottling Co. v. New Hampshire Ins. Co., 407 P.2d 1009, 1013 (Alaska 1965), we said:
 We are in agreement with those authorities which hold that where the terms of a [contract] are clear and unambiguous, the intent of the parties must be ascertained from the instrument itself, and that where there is uncertainty or ambiguity, intent may be ascertained from the language and conduct of the parties, the objects sought to be accomplished and the surrounding circumstances at the time the contract was negotiated (footnote omitted).

*See also* Port Valdez Co. v. City of Valdez, 437 P.2d 768, 771 (Alaska 1968); Erwin, "Parol Evidence or Not Parol Evidence in Alaska," 8 Alaska L.J. 20 (1970).

1. Restatement of Contracts §§ 229–231, 237 (1932).

2. 4 Williston, The Law of Contracts §§ 600–601, 606, 610 (3d ed. 1961).

3. Port Valdez Co. v. City of Valdez, 437 P.2d 768, 771 (Alaska 1968); Pepsi Cola Bottling Co. v. New Hampshire Ins. Co., 407 P.2d 1009, 1013 (Alaska 1965).

certain whether it is clear and unambiguous. If it is, then the obligations of the parties must be determined from the contract itself. Only if the contract is ambiguous may parol testimony be taken to ascertain the intention of the parties thereto.

In *Alaska Placer Co.* this court, while citing the previous Alaska cases, relied upon the opposing theory of contractual interpretation espoused by Professors Corbin[4] and Wigmore.[5] This approach would require a hearing in every case where there is a dispute over contractual terms in order to ascertain the actual intention of the parties on the theory that words can mean different things to different people.

Thus, the law of Alaska now contains case authority for two opposing approaches. Since the majority opinion favors the "objective approach", I would overrule *Alaska Placer Co.* directly and remove any possible uncertainty over its demise.[6]

4. 3 Corbin on Contracts § 536 (1960).

5. 9 Wigmore on Evidence § 2462 (3d ed. 1940).

6. *See* Erwin, Parol Evidence or Not Parol Evidence in Alaska, 8 Alaska Law Journal 20 (1970).